[No. H031196. Sixth Dist. Oct. 6, 2009.]

JOHN C. GORMAN et al., Plaintiffs and Appellants, v. TASSAJARA DEVELOPMENT CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Bowman & Brooke, Daniel J. Smith; Gorman & Miller, John C. Gorman and Charles J. Stiegler for Plaintiffs and Appellants.

Archer Norris, W. Eric Blumhardt, William H. Staples, William L. Coggshall; Selman Breitman, Lincoln V. Horton and Elaine F. Harwell for Defendants and Respondents.

**OPINION**

**RUSHING, P. J.—**

## I. INTRODUCTION

In this appeal, plaintiffs assert that the trial court did not award them enough attorney fees and costs against their former general contractor and that the court should have explained its awards.

In November 1999, defendant Tassajara Development Corporation (usually contractor) promised by written contract to serve as general contractor for the construction of a residence for plaintiffs John C. Gorman and Jennifer Cheng (collectively plaintiffs), husband and wife. The contract provided in part: "In the event of litigation between the parties, or if a party becomes involved in litigation because of wrongful acts of the other party, the prevailing party will be entitled to recover reasonable attorneys' fees."

Gorman is an attorney who is the chief executive officer, chief financial officer, president, and secretary of the law firm of Gorman & Miller, PC, a professional corporation (usually the Gorman firm). In December 2003, Gorman initiated this lawsuit by filing a complaint on behalf of plaintiffs against numerous defendants, including contractor, alleging the defective construction of the residence. In May 2006, plaintiffs entered into a global settlement with a number of defendants, including contractor. Part of that settlement provided, "it is agreed that Plaintiffs shall be deemed to be the

'prevailing parties' in the Action solely for the purpose of invoking plaintiffs' rights to recover attorneys' fees and costs pursuant to the terms of the Construction Contract and that plaintiffs are entitled to recover costs as authorized by law as if they were prevailing parties in the Action."

Plaintiffs ultimately requested attorney fees of $1,350,538.83[1] and costs in excess of $266,561.96, including the fees and costs for filing their motion. Almost half these fees were billed by Gorman personally. After a contested hearing on their motion, in a 27-word order the trial court awarded plaintiffs "reasonable attorneys' fees of $416,581.37 and reasonable costs of $142,432.46." The trial court subsequently denied plaintiffs' request for a statement of decision and their motions for a new trial and for reconsideration of its order. Plaintiffs have appealed from the resulting judgment. As we will explain below, despite close study of the record, including the motion and opposition, we are unable to surmise a reasonable explanation for either of the amounts awarded. Given the apparent arbitrariness of the awards, we will reverse the judgment and remand for further proceedings.

## II. PROCEDURAL HISTORY

### A. *The Litigation and Settlement*

On November 17, 1999, plaintiffs entered into a contract signed by James Simmons on behalf of contractor whereby contractor would serve as a general contractor and construct a residence for plaintiffs in Los Altos Hills at a cost of $1,501,520, subject to increases or decreases specified in written change orders.

During the construction, plaintiffs expressed their concerns to contractor about the lack of progress and the materials used. After they took occupancy of the house on December 27, 2002, they discovered a number of problems with the construction. On December 13, 2003, Gorman and the Gorman firm filed a complaint in the Santa Clara County Superior Court on behalf of himself and his wife alleging defective construction, naming as defendants contractor and 23 other businesses and individuals who allegedly served as general contractors, subcontractors, and suppliers of material for the construction of the residence.

---

[1] Plaintiffs' briefs on appeal repeatedly asserted that their total claimed fees were $1,428,656.90, but when we requested clarification of their claims, their supplemental letter brief apologized for this $78,118.07 miscalculation. As will appear, one theme in this case is that attorneys are not mathematicians. Footnotes 31 and 32, *post*, explain other fee calculation errors by plaintiffs in their favor of $65,000 and $2,440.58. Other footnotes (including fn. 16, *post*) explain difficulties that contractor's counsel has had with numbers.

On March 2, 2004, contractor filed a cross-complaint seeking indemnity from the other defendants in the case. It also alleged that plaintiffs had breached the construction contract by not paying what they owed.

A first amended complaint was filed on May 19, 2004, by Gorman. This complaint expanded plaintiffs' claims to include professional malpractice by David Takamoto, the architect plaintiffs hired on February 2, 1999, and by Shawn Massihpour and A.S.E. Consulting, structural engineers employed by Takamoto.

In July 2004, the Gorman firm associated the law firm of Bowman and Brooke LLP (the Bowman firm), with Daniel Smith doing much of the subsequent work of that firm.

A stipulation filed July 26, 2004, agreed to a special master to coordinate discovery and conduct settlement conferences. Upon the death of the special master, the parties agreed to a new special master by stipulation filed September 22, 2004. The special masters eventually issued 14 pretrial orders, each approved by Judge Elfving. The first order, filed July 26, 2004, provided, among other things, that all defendants were deemed to have filed cross-complaints for indemnity and contribution against each other. It also provided for creation of a document depository, and "[c]opying services will be at each party's expense."

In July 2005, at Smith's recommendation, plaintiffs retained Attorney Semha Alwaya to render opinions about insurance coverage.

A 50-page second amended complaint was filed on November 29, 2005, by Gorman and Smith, naming the original 24 defendants and about 26 more.

In May 2006, Attorney Bruce Janke appeared at several depositions on behalf of plaintiffs.

After four settlement conferences, on October 15, 2004, May 13, 2005, July 13, 2005, and July 27, 2005, and mediation on March 6, 2006, March 17, 2006, and May 15, 2006, plaintiffs reached a settlement with 36 of the defendants, including contractor, in a written agreement dated May 15, 2006. The agreement is 13 pages, not including signatures. Under the settlement, contractor agreed to make an initial payment to plaintiffs of $2,430,000 (not including discovery sanctions ordered against one defendant) by June 26, 2006, in exchange for a mutual release of all claims.

As stated in the introduction, the agreement provided that plaintiffs were deemed the prevailing parties for purposes of recovering attorney fees under

the construction contract and costs.[2] The agreement also provided that it "does not include or constitute an admission of any fact, or of liability or fault by any Party regarding any fact, claim, allegation, issue of law or violation of law . . . . This agreement may not be used as evidence of any wrongdoing, misconduct or liability by any Party or anyone else."

An exhibit attached to the settlement agreement and incorporated into it by reference reflected that contractor's contribution to the settlement is $994,000 (41 percent of the total), with 17 other sets of defendants paying to contractor the balance to be paid plaintiffs.[3]

---

[2] The entire agreement on these topics is set forth in this footnote. We will quote particular provisions later in the text when relevant to our analysis.

"In addition to the Initial Consideration set forth above, Tassajara and its insurers shall pay to Plaintiffs such amount as the court determines to be reasonable attorneys' fees and costs (including reasonable expert and consultant fees) as may be allowed pursuant to the Construction Contract or as otherwise permitted by law ('Second Payment'). Notwithstanding that this is a settlement and that the matter has not proceeded to final judgment, it is agreed that Plaintiffs shall be deemed to be the 'prevailing parties' in the Action solely for the purpose of invoking plaintiffs' rights to recover attorneys' fees and costs pursuant to the terms of the Construction Contract and that plaintiffs are entitled to recover costs as authorized by law as if they were prevailing parties in the Action. Plaintiffs' claims for attorneys fees and costs under this provision shall extend up to but no later than the date that this Agreement becomes binding based upon plaintiffs' receipt of a copy of this Agreement that has been fully and validly executed by all Settling Parties. In addition, it is agreed that Plaintiffs shall be permitted to seek recovery of any and all reasonable attorneys' fees and costs related to judicial determination of the amount of fees and costs that they are entitled to recover. Tassajara reserves all defenses to Plaintiffs' claims for recovery of attorneys fees and costs, including expert fees, with the exception that Tassajara agrees that Plaintiffs shall be permitted to recover as 'costs' under this provision their expert, consultant, and other fees and costs that qualify as 'Stearman' costs under the authority of Stearman v. Centex Homes, 78 Cal.App.4th 611 [92 Cal.Rptr.2d 761] (2000), in an amount to be determined by the court, and Tassajara agrees that it will not assert that Plaintiffs' 'Stearman' costs were or should have been included as a portion of the Initial Payment. Plaintiffs' claim for attorneys' fee[s] and costs (including 'Stearman' costs) shall be submitted to the court by appropriate motion and, upon its resolution, shall be reduced by the court to an immediately enforceable judgment against Tassajara, which judgment shall be deemed to be a 'several' judgment under Cal. Civ. Proc. Code § 579. It is further understood and agreed that Plaintiffs and Tassajara shall each have the right to appeal the judgment rendered by the Superior Court. In the event of any appeal, Plaintiffs shall be entitled to post-judgment interest as authorized by law. Plaintiffs shall have 75 days from their receipt of a copy of this Agreement that has been fully and validly executed by all Settling Parties in which to file their motion for recovery of attorneys' fees and costs.

"Nothing in this section is intended to affect Plaintiffs' or Tassajara's right to recover attorneys' fees and costs against parties or persons, including but not limited to insurers of settling parties, who are not part of this settlement agreement. Tassajara represents and warrants that it has sufficient assets and/or insurance to cover the payment required to be made to Plaintiffs under this provision."

The agreement thus alternates between "attorneys fees" and "attorneys' fees."

[3] For example, J.D. Haaland Construction, Inc., and its alleged principal shareholder, Judd Haaland, allegedly involved in the framing and window and door installation, agreed to contribute $235,000. David Takamoto and Green 3 Studio, Inc., agreed to contribute $500,000. Davey

## B. *The Motion for Attorney Fees and Costs*

To avoid repetition, we will summarize the procedural history in this part and will summarize the parties' arguments later. On July 31, 2006, plaintiffs filed a "Motion for Attorneys' Fees and Costs" from contractor. The notice of motion and accompanying memorandum of points and authorities sought recovery of attorney fees and costs of $1,729,391.35, without breaking down this total. The motion was accompanied by a memorandum of costs (signed by Craig Hansen, an associate attorney in the Gorman firm) that itemized costs of $266,561.96, while an attached declaration, the first by Hansen, explained that plaintiffs were seeking total costs of $343,516.72.[4] The declaration further explained that this total included costs of $342,319.23 incurred prior to settling the case in May 2006, and an additional $1,197.49 in postsettlement costs in preparing its motion for fees and costs and in resisting contractor's motion for discovery regarding legal fees. The components of the presettlement costs were $68.74 for Attorney Alwaya, $6,283.76 for the Bowman firm, and $335,966.73 for the Gorman firm.

The hearing, initially set for August 24, 2006, was continued on August 10, 2006, at contractor's request by Judge Elfving to October 3, 2006, with its opposition due by September 19, 2006. Judge Elfving was unavailable on October 3, 2006, so Judge Ward granted the request of the parties to continue the hearing until Judge Elfving could hear it on October 19, 2006.

On September 19, 2009, contractor filed a document entitled "Tassajara Development Corporation's opposition to plaintiff's [*sic*] motion for attorney's fees and costs; or in the alternative motion to tax fees and costs."[5] (Capitalization omitted.) Plaintiffs filed a response to this opposition.

At the hearing on October 19, 2006, which lasted less than an hour, the court took the motion under submission without asking any questions of the parties or expressing any agreement or disagreement with any of the points

Roofing, Inc., its alleged successors in interest, DRI Services, DRI Commercial, and DRI Residential, and their principals, Tim Davey, Alan Ruben, and Brian Flaherty, allegedly involved in the roofing, decking, and waterproofing, agreed to contribute $150,000.

[4] The Hansen declaration did not compute this total, but it is easy to derive from the costs components described in the declaration. The declaration does not explain which additional costs of $76,954.76 are requested outside of the cost memo, but the difference presumably could be derived by comparing the costs in the cost memo with the costs listed in the billings of Semha Alwaya and the Gorman and Bowman firms. For example, we do not see any of the $68.74 costs of Alwaya included in the cost memo.

[5] Although plaintiffs designated contractor's opposition as part of the clerk's transcript on appeal and declarations supporting the opposition were included in the record on appeal, this document was omitted from the record. We have granted their request to augment the record with this document.

made in the motion or opposition.[6] The following day it issued the 27-word order awarding fees and costs described in the introduction above (see, *ante*, at p. 53).[7] The trial court did not expressly disapprove of any particular components of plaintiffs' claims as unreasonable or unnecessary.

On October 30, 2006, plaintiffs submitted a written request for a statement of decision asking the court to answer 29 questions, which was opposed by contractor. On November 6, 2006, without a hearing on plaintiffs' request, the court issued an order denying the request without stating any reasons.

Meanwhile, on November 3, 2006, plaintiffs filed a notice of intention to move for a new trial on the attorney fee award and a motion to reconsider, modify, or clarify the court's award. Contractor filed opposition. After a hearing on November 30, 2006, the following day the court filed an order denying plaintiffs' motions without stating any reasons. The court thereafter entered a judgment for attorney fees and costs in favor of plaintiffs as awarded by its earlier order.

## III. PLAINTIFFS' PROCEDURAL OBJECTIONS

Before reaching the merits of the trial court's awards, we consider whether the trial court was required by statute or case law to provide a statement or some other explanation of its decision, whether plaintiffs timely requested a statement of decision, whether the trial court erred in not expressly ruling on evidentiary objections, and whether contractor was required to file a formal motion to tax costs.

### A. *The Need for a Statement of Decision*

Plaintiffs claim the trial court erred by not providing a statement of decision in response to their request. Plaintiffs did not file a written request for a statement of decision before the October 19, 2006 hearing on their motion for attorney fees and costs. They did not orally request a statement of decision at the hearing. They filed a written request 10 days after the court issued its order on their motion.

Code of Civil Procedure section 632[8] provides in part: "In superior courts, upon the trial of a question of fact by the court, written findings of fact and

---

[6] Plaintiffs did not designate the clerk's minutes of this hearing as part of the record on appeal. A reporter's transcript of the hearing appears in the record.

[7] After reciting the date and nature of the hearing, the order stated: "The matter having been submitted, the motion is granted in part and denied in part. Plaintiffs are awarded reasonable attorneys' fees of $416,581.37 and reasonable costs of $142,432.46."

[8] Unspecified section references are to the Code of Civil Procedure.

conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision. The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision."

### (1) *Is a Statement of Decision Required on a Motion for Attorney Fees?*

Plaintiffs assert that the hearing on their motion for attorney fees in this case qualifies as a "trial" under section 632. The California Supreme Court has indicated otherwise in two cases. In *Maria P. v. Riles* (1987) 43 Cal.3d 1281 [240 Cal.Rptr. 872, 743 P.2d 932] (*Maria P.*), the defendants-appellants challenged attorney fees awarded under the private attorney general theory codified in section 1021.5. Among other things, the appellants in *Maria P.* complained that the trial court had erred by failing to issue a statement of decision under section 632. The high court observed: "Cases decided under section 632 generally have held that a statement of decision is not required upon decision of a motion. (See, *Lavine* v. *Hospital of the Good Samaritan* (1985) 169 Cal.App.3d 1019, 1026 [215 Cal.Rptr. 708]; *In re Marriage of Simmons* (1975) 49 Cal.App.3d 833, 836 [123 Cal.Rptr. 213] [findings of fact are only required on issues joined by the pleadings where the decision of the court following the findings is a judgment]; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 371, pp. 377–378.) Courts have created an exception for proceedings involving custody of children (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 792 [218 Cal.Rptr. 39, 705 P.2d 362]; *In re Rose G.* (1976) 57 Cal.App.3d 406, 418 [129 Cal.Rptr. 338]). However, we have discovered no case requiring a statement of decision for an order on a motion for attorney fees." (*Maria P.*, at p. 1294.)

The court's analysis, however, did not stop at this point. The court went on to observe that its prior decisions "require the trial court first to determine a touchstone (or lodestar) figure based on the time spent and reasonable hourly compensation for each attorney involved in the case" (*Maria P., supra*, 43 Cal.3d at p. 1294), though the trial court has discretion to make upward or downward adjustments. The court noted, "The court's failure to specify in its written order the basis of its calculation of the award, and the absence in the appellate record of a transcript of the fee hearing or a settled statement of that proceeding (Cal. Rules of Court, rule 4(e)) make it impossible for us to determine whether the trial court based its award on the lodestar adjustment

method." (*Id.* at p. 1295.) However, the court concluded that reversal was not warranted because the appellants had failed to carry their burden of providing a record adequate for review by way of settled statement. (*Id.* at pp. 1295–1296.)

The California Supreme Court returned to this topic 14 years later in *Ketchum v. Moses* (2001) 24 Cal.4th 1122 [104 Cal.Rptr.2d 377, 17 P.3d 735] (*Ketchum*). At issue on appeal was whether the trial court had properly calculated the attorney fees due after it granted a special motion to strike a complaint under section 425.16. The trial court had doubled the lodestar amount in making its award. In the course of considering the propriety of this award, the high court stated: "Ketchum also contends that the superior court erred by failing to provide a 'reasoned explanation' for denying his objections to specific items in the billing records. The superior court was not required to issue a statement of decision with regard to the fee award. (See *Maria P. v. Riles, supra,* 43 Cal.3d at p. 1294.)" (*Ketchum,* at p. 1140.)

As in *Maria P.,* the court's analysis did not stop there. The court continued as follows. "Moreover, although Ketchum opposed the motion for attorney fees, he did not request a statement of decision with specific findings. ' "All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown." ' (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].)" (*Ketchum, supra,* 24 Cal.4th at p. 1140.) As in *Maria P.,* the court concluded that the appellant had failed to provide an adequate record on appeal to review the fee award. (*Ketchum, supra,* 24 Cal.4th at pp. 1140–1141.) The award in *Ketchum* was reversed on other grounds, but not due to the lack of a statement of reasons.[9]

Plaintiffs rely on footnote 6 in *Mandel v. Lackner* (1979) 92 Cal.App.3d 747 at page 759 [155 Cal.Rptr. 269] (*Mandel*), disapproved on another ground in *Serrano v. Unruh* (1982) 32 Cal.3d 621, 630, footnote 12 [186 Cal.Rptr. 754, 652 P.2d 985] (*Serrano IV*), a case predating *Maria P.,* as establishing that an attorney fee determination is a "trial." *Mandel* did not go this far, however. The court observed that formal findings would be mandatory on the issues of the time and unit-value factors of attorney fees if requested by a party upon the trial of a question of fact. The court stated in this footnote, "Such 'trial' was conducted on respondent's motion for attorneys' fees, and formal

---

[9] *Ketchum* gave three reasons for remanding for a recalculation of fees. "[I]t was error for the superior court to apply an enhancement for contingent risk to the fees on fees accrued after the motion to strike was granted." (*Ketchum, supra,* 24 Cal.4th 1122, 1142.) "By using counsel's qualifications and the submitted declarations to justify both the hourly rate and the multiplier, the court appears to have counted the same factor twice." (*Ibid.*) "[T]he superior court may improperly have permitted its disapproval of his litigation strategy to influence its selection of the enhancement amount." (*Ibid.*)

findings were requested, but they are not ordinarily required in proceedings upon a motion. (*In re Marriage of Simmons*[, *supra*,] 49 Cal.App.3d 833, 836 . . . .)" (*Mandel, supra,* 92 Cal.App.3d at p. 758, fn. 6.) The *Mandel* court declined in this footnote to reach the issue of whether findings were required, as noted by *Rebney v. Wells Fargo Bank* (1991) 232 Cal.App.3d 1344, 1348 [284 Cal.Rptr. 113] (*Rebney*).

*Rebney*, decided before *Ketchum*, concluded that no statement of decision under section 632 was required by *Maria P.* or *Mandel*, though the trial court had issued one. "The record need only show that the attorney fees were awarded according to the 'lodestar' or 'touchstone' approach. [¶] The court's statement of decision satisfied this minimal requirement, as it expressly stated that the court had awarded fees based on lodestar amounts, with further consideration of counsel's contributions to the litigation. Nothing more was necessary. The court was not required to explain which of counsel's hours were disallowed, or how or whether any hours were apportioned. On appeal, we must infer all findings on these points in favor of the prevailing parties. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].)" (*Rebney, supra,* 232 Cal.App.3d at p. 1349.)[10] *Rebney* went on to conclude in the alternative that if section 632 applied, the appellant "waived any error by failing to bring the claimed defects to the attention of the trial court after issuance of the statement of decision." (232 Cal.App.3d at pp. 1349–1350.)

Some later opinions (all involving attorney fees awarded after a special motion to strike under § 425.16, subd. (c)) have interpreted *Maria P.* and *Ketchum* as holding that no statement of decision is needed after a hearing on a motion for attorney fees. (Compare *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1252 [49 Cal.Rptr.3d 861] ["A statement of decision is not required regarding an award of attorney fees pursuant to a motion."] and *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1323 [81 Cal.Rptr.3d 866] ["There is no requirement, however, that the trial court provide a statement of decision . . ."] with *Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 342, fn. 6 [42 Cal.Rptr.3d 607] ["Although a more detailed explanation would certainly have been helpful, a

---

[10] In emphasizing that "[t]he record need only show" that the trial court employed the lodestar method, *Rebney* does not appear to require the trial court to expressly acknowledge the lodestar method or lodestar amount. (*Rebney, supra,* 232 Cal.App.3d at p. 1349.) While the record before the *Rebney* court included a statement of decision expressly acknowledging the lodestar method and fixing lodestar amounts (*id.* at p. 1347), the decision suggests that the trial court gave the parties more than the law required.

trial court is not required to issue a statement of decision with regard to a fee award, unless a party timely requests one."].)[11]

As indicated above, the California Supreme Court's statements in *Maria P.* and *Ketchum* that an attorney fee award need not be explained in a statement of decision are, at best, alternative holdings, with those decisions resting equally on other grounds. It is notable that in neither case did the California Supreme Court reverse the attorney fee award due to lack of a statement of decision.

Plaintiffs seek to distinguish *Maria P.* as involving attorney fee rulings that are not intended, unlike the ruling here, to be entered as a judgment. We doubt the significance of this factual distinction, but we need not ponder this issue further in light of the timing of plaintiffs' request for a statement of decision.

### (2) *Was Plaintiffs' Request for a Statement of Decision Timely?*

■ If we assume for the sake of discussion that the hearing in this case amounted to a trial within the meaning of section 632, it was a trial that was "concluded within one calendar day or in less than eight hours over more than one day." In such cases, according to the statute, "the request [for a statement of decision] must be made prior to the submission of the matter for decision." (*Ibid.*) A party's entitlement to a statement of decision depends on the party making a timely request. (*In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 280 [268 Cal.Rptr. 83]; *In re Marriage of Gray* (2002) 103 Cal.App.4th 974, 980 [127 Cal.Rptr.2d 271].)

Plaintiffs assert that the trial on this motion lasted longer than a day. They argue, relying on *Gordon v. Wolfe* (1986) 179 Cal.App.3d 162 [224 Cal.Rptr. 481], that the trial included all judicial consideration of their motion, which involved 520 pages of briefing and evidence, from the time the motion was filed on July 31, 2006, through its continuances on August 10 and October 3 to the ruling on October 20, 2006, whether that consideration took place on or off the bench, and apparently during or after regular working hours. They suggest there was a three-month trial of this issue.

■ The same contention was rejected in *In re Marriage of Gray, supra*, 103 Cal.App.4th 974 at pages 978–979, a case cited by neither side, in the

---

[11] We note that the motions in the cited cases essentially sought attorney fees as costs, not damages. As explained more fully below in part IV.A.(2)(A) (see, *post*, at p. 78), when attorney fees are sought as tort damages, they "may not be asserted by post-trial motion but rather must be pleaded and proved to the trier of fact," unless "the parties stipulate otherwise." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 869, fn. 4 [39 Cal.Rptr.2d 824, 891 P.2d 804].) We do not intend to suggest that no statement of decision is required upon request after a court trial seeking attorney fees as tort damages.

following thorough discussion. "Appellant argues that 'when, as in the case at bar, the court is presented with volumes of evidence and documentation, and asked to consider a [31-]year marriage, and divide a community estate in excess of $3 [million] in a process that took more than a year to complete, it is inconceivable that trial lasted less than one day irrespective of the actual number of hours spent arguing the case.' However, in setting the time for a request for a statement of decision, section 632 does not speak to the complexity of issues in the case. Rather, it speaks to the time consumed in the trial of the matter. As we have said, appellant has failed to show that the trial court erred in making an express finding that the trial of this case lasted less than eight hours.

"Appellant relies on *Gordon v. Wolfe*[, *supra,*] 179 Cal.App.3d 162, 166 . . . where the court remarked, 'Courts may have to count days, but they are not required to count hours and minutes under . . . section 632.' However, when the *Gordon* court made this remark, section 632 contained no reference to a trial lasting less than eight hours over more than one day. Rather, the statute referred only to a trial lasting less than one day. (Stats. 1981, ch. 900, § 1, p. 3425.)

"The status of section 632 when *Gordon* was decided, in 1986, and its subsequent amendment, were described by the court in *Palm v. Schilling* (1988) 199 Cal.App.3d 63 [244 Cal.Rptr. 600], as follows: 'At the time of trial, . . . section 632 obligated the court to issue a statement of decision, if one was requested, after "the trial of a question of fact by the court . . . ." In trials lasting more than one day, the request was required to be made within 10 days after the court's tentative decision. If the trial was concluded in less than a day, however, the request had to be made before the matter was submitted.

" 'Problems arose when trials were conducted over a period of several days but actually consumed fewer than eight hours of court time. (See, e.g., *R. E. Folcka Construction, Inc.* v. *Medallion Home Loan Co.* (1987) 191 Cal.App.3d 50 [236 Cal.Rptr. 202]; *Gordon* v. *Wolfe*[, *supra,*] 179 Cal.App.3d 162 . . . , *Mitchell* v. *County of Orange* (1985) 165 Cal.App.3d 1185 [211 Cal.Rptr. 563], and *Architects & Contractors Estimating Service, Inc.* v. *Smith* (1985) 164 Cal.App.3d 1001 [211 Cal.Rptr. 45].) The Legislature has hopefully put an end to this semantic tempest by amending section 632, effective January 1, 1988, to provide that a request for statement of decision must be made before the matter is submitted where "the trial is concluded within one calendar day or in less than eight hours over more than one day . . . ." (Stats. 1987, ch. 207, § 1.)' (*Palm v. Schilling, supra,* 199 Cal.App.3d 63, 66–67, fn. 2.)

"In light of the 1987 amendment of section 632, *Gordon*'s remark no longer states good law on this point. Rather, in light of the 1987 amendment to section 632, trial courts must keep track of the time of short cause matters. Although, at the time of trial in this case, no legal authority required the courtroom clerk to keep track of the time of trial in the minutes, in the future the courtroom clerk should keep track in the minutes so that the court, counsel, and the parties will know when a request for a statement of decision must be made."

In our case, the trial court rejected plaintiffs' request for a statement of decision without expressly adopting contractor's opposition that the hearing had lasted less than a half-hour.

■ The 1987 amendment of section 632 equates a one-day trial with a trial taking eight hours over more than one calendar day. The clear implication is that an eight-hour trial is considered a one-day trial. The reality is that trial judges spend additional time off the bench preparing for hearings, researching the law, and reading motions and briefs, but the statute indicates an intent not to count that time as trial time. Otherwise the trial judge would have to submit timesheets to the parties in a case so they would know when to request a statement of decision. The parties may be expected to know and add up the time they have spent in court hearings on a case, but not how long the judge has considered the case outside of the courtroom. We reject plaintiffs' argument that judicial time off the bench should count in determining when to request a statement of decision. We conclude that their request, filed 10 days after the court had issued its order on their motion, was untimely and that they were not entitled to a statement of decision, even assuming for the sake of discussion that it would otherwise be necessary to prepare one for a hearing on a motion requesting attorney fees.[12]

### (3) *Case Law Regarding Awards of Attorney Fees*

Plaintiffs appear to contend that case law, apart from section 632, requires trial courts to provide some explanation of their rulings on requests for attorney fees.

■ It is true that the California Supreme Court has provided ample guidance to trial courts for determining awards of attorney fees. For example, in *Ketchum, supra,* 24 Cal.4th 1122 the court explained its earlier decision in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]

---

[12] In light of this conclusion, we need not determine when and how the absence of a requested statement of decision may be prejudicial. (Compare *Social Service Union v. County of Monterey* (1989) 208 Cal.App.3d 676, 681 [256 Cal.Rptr. 325], and cases there cited, with § 475 and Cal. Const., art. VI, § 13.)

(*Serrano III*) as follows at pages 1131–1132. "Under *Serrano III*, a court assessing attorney fees begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.' (*Serrano III, supra*, 20 Cal.3d at p. 48.) We expressly approved the use of prevailing hourly rates as a basis for the lodestar, noting that anchoring the calculation of attorney fees to the lodestar adjustment method ' "is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts." ' (*Id.* at p. 48, fn. 23.) In referring to 'reasonable' compensation, we indicated that trial courts must carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative efforts is not subject to compensation. (See *id.* at p. 48.)

"Under *Serrano III*, the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. (*Serrano III, supra*, 20 Cal.3d at p. 49.) The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services. The ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' (*Ibid.*)" (Italics omitted.)

*Ketchum* proceeded to review how the Supreme Court, after *Serrano III*, has repeatedly emphasized the importance of using the lodestar calculation in its decisions in *Serrano IV, supra*, 32 Cal.3d 621, 624, 639, *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322 [193 Cal.Rptr. 900, 667 P.2d 704], *Maria P., supra*, 43 Cal.3d 1281, 1294–1295, and *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511] (*PLCM*). (*Ketchum, supra*, 24 Cal.4th at pp. 1133–1134.)

*PLCM, supra*, 22 Cal.4th 1084, concluded, among other things, as to fees awarded under Civil Code section 1717 pursuant to a contractual agreement, "that the lodestar method, as applied to the calculation of attorney fees for in-house counsel is presumably reasonable, although in exceptional circumstances, the trial court is not precluded from using other methodologies." (22 Cal.4th at p. 1097.)

Yet, as explained above, despite all this emphasis on trial courts beginning their attorney fees calculations with a lodestar amount, *Ketchum* also observed that the trial court in the case before it was not required to issue a statement of decision with respect to the fee award. (*Ketchum, supra,* 24 Cal.4th at p. 1140.)[13] None of these Supreme Court decisions required a trial court to provide an explanation of its decision on a motion for attorney fees. This precedent teaches trial courts how to think about claims for fees, not what to say in ruling on the claims.

None of the other cases cited by plaintiffs establishes as a general rule that trial courts must provide such an explanation. We have already distinguished *Mandel, supra,* 92 Cal.App.3d 747 above (see, *ante,* at p. 59). *In re Marriage of Cueva* (1978) 86 Cal.App.3d 290 [149 Cal.Rptr. 918] said nothing about the trial court providing an explanation. The problem in that case was that "there was nothing before the trial court disclosing services of such a nature and extent as to justify an attorney fee of $21,000." (*Id.* at p. 301.)

In *Tilem v. City of Los Angeles* (1983) 142 Cal.App.3d 694 [191 Cal.Rptr. 229], the appellate court stated: "we have no way of determining how the trial court arrived at the figure of $15,000 for attorney fees in the state actions as against a total undifferentiated claim of $70,000. [¶] Since we have concluded that the matter must be returned to the trial court to redetermine the issue of damages, we think it appropriate to also provide the trial court an opportunity to redetermine the amount of litigation costs and set forth the reasons therefor." (*Id.* at pp. 711–712.) This reversal was not predicated on the absence of an explanation for the attorney fee award nor did the decision purport to establish a general rule requiring an explanation of all awards of attorney fees.

*State of California v. Meyer* (1985) 174 Cal.App.3d 1061 [220 Cal.Rptr. 884] involved landowners seeking mandatory attorney fees under sections 1268.610 and 1235.140 following the state's abandonment of a condemnation

---

[13] In *In re Vitamin Cases* (2003) 110 Cal.App.4th 1041 [2 Cal.Rptr.3d 358], a decision on which plaintiffs rely, the First District Court of Appeal cited *Ketchum* as follows on page 1052. "When the record is unclear whether the trial court's award of attorney fees is consistent with the applicable legal principles, we may reverse the award and remand the case to the trial court for further consideration and amplification of its reasoning. (See, e.g., *Ketchum v. Moses*[, *supra,*] 24 Cal.4th [at p.] 1142 . . . .)"

We read this page of *Ketchum* differently. As explained above (see, *ante,* fn. 9), *Ketchum* reversed due to apparent errors in the decision, not simple lack of clarity in the record. We do not believe that *Ketchum* ignored the principles that no judgment shall be reversed unless "the error complained of has resulted in a miscarriage of justice" (Cal. Const., art. VI, § 13) and it appears that the party "complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown" (§ 475).

action. While awarding some fees, the trial court declined to make any award for the fees involved in collecting attorney fees. (174 Cal.App.3d at p. 1074.) The appellate court concluded that the landowners were entitled to reasonable fees for their collection efforts and stated, "Since we cannot determine how the trial court arrived at the figure of $30,000 and since landowners are entitled to reasonable attorneys' fees for at least part of their efforts in opposing the motion to tax costs, we remand the issue of attorneys' fees to the trial court for clarification or redetermination of litigation costs and advise it set forth the reasons therefor." (*Id.* at p. 1074.) The reversal was based on an error in denying any collection fees. The opinion merely advised the trial court in that case to provide reasons on reconsideration.

Similarly, the issue in *Moran v. Oso Valley Greenbelt Assn.* (2001) 92 Cal.App.4th 156 [111 Cal.Rptr.2d 636] was whether the trial court abused its discretion in declining to award attorney fees under Corporations Code section 8337 after finding that a corporation had wrongfully rejected a demand to produce its minutes for inspection. (92 Cal.App.4th at p. 158.) The appellate court noted an inconsistency between this finding and its ruling and stated: "the court also, without explaining its decision either on the record or in its order, denied Moran recovery of attorney fees and costs. Although Corporations Code section 8337 does not require a written order explaining the court's decision, without any explanation of its reasoning, we cannot conclude this aspect of the court's decision had any reasonable basis. Perhaps the court did have a sound rationale, but we simply cannot reach this conclusion based on the order and the reporter's transcript of the court's decision. The decision is therefore subject to reversal." (*Id.* at pp. 160–161.)[14] Noting that an attorney fee award under the statute is discretionary, the court continued, "We do, however, encourage the trial court to consider all of the facts of a particular case and articulate its reasons (either on the record in open court or in a written order) for granting or denying such an award." (92 Cal.App.4th at p. 161.) To the extent that the appellate court sought to generalize this last observation beyond this particular case, at most it applies to attorney fees sought under Corporations Code section 8337. It was not stated as a general rule for all decisions on requests for attorney fees.

Plaintiffs also assert that it is the federal rule that "district courts have a duty to explain their reasoning when ruling on a motion for attorneys' fees."

---

[14] Another appellate court made a similar complaint in a case not cited by the parties. "[O]ur task has been complicated by the terse nature of the trial court's ruling itself, which gives virtually no explanation for the basis of the substantially enhanced award of fees and costs here. Because it merely lists the enhancement factors used, without a more complete explanation of their applicability in this context, the order is subject to question regarding the factual basis of the exercise of discretion made." (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 624 [98 Cal.Rptr.2d 388].)

Assuming that there is such a rule, plaintiffs acknowledge that it is not binding in a California state court action alleging breach of contract and negligence.

We find no California case law analogue to section 632 requiring trial courts to explain their decisions on all motions for attorney fees and costs, or even requiring an express acknowledgment of the lodestar amount. The absence of an explanation of a ruling may make it more difficult for an appellate court to uphold it as reasonable, but we will not presume error based on such an omission. As reiterated in *Ketchum, supra,* 24 Cal.4th 1122 at page 1140: " ' "All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown." ' (*Denham v. Superior Court*[, *supra,*] 2 Cal.3d 557, 564 . . . .)" In the absence of evidence to the contrary, we presume that the trial court considered the relevant factors. (Cf. *Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 998 [242 Cal.Rptr. 272] ["We are entitled to presume the trial court considered all the appropriate factors in choosing the multiplier and applying it to the whole lodestar."].) In awarding attorney fees in a lesser amount than requested, trial courts are not required to specify each and every claimed item found to be unsupported or unreasonable. (Cf. *Melnyk v. Robledo* (1976) 64 Cal.App.3d 618, 625 [134 Cal.Rptr. 602] ["Nor is there any merit to defendant's contention that it was incumbent upon the trial court to specify each and every item in defendant's memorandum with which the court found fault. This would be inconsistent with the well-established rule discussed above that the trial court is entitled to take all of the circumstances into account and is not bound by the itemization claimed in the attorney's affidavit."].)

### B. *Express Ruling on Evidentiary Objections*

Plaintiffs assert that they were prejudiced by the court's failure to expressly rule on some evidentiary objections.

In support of contractor's opposition to plaintiffs' motion for fees and costs, contractor submitted a declaration by Dennis Govan, a licensed architect. He offered the following opinions. The architectural plans prepared by defendant Takamoto and the structural plans prepared by defendants Shawn Massihpour and A.S.E. Consulting were deficient. Contractor did not fall below its own standard of care in relying on them. Many subcontractors worked directly for plaintiffs outside of contractor's control. Therefore, contractor was not liable for the negligence of these defendants.

Plaintiffs objected to Govan's opinions in writing in part as lacking foundation or personal knowledge and containing improper legal conclusions

and hearsay. They did not renew their objections at the October 19, 2006 hearing on their motion. The court's written order did not expressly rule on these objections.

By their motions for new trial and reconsideration, plaintiffs asked for a ruling on their objections. The order denying their motions did not expressly rule on their objections.

Plaintiffs assert that the applicable rule can be found in cases involving motions for summary judgment. The California Supreme Court is currently considering the issue—"Are evidentiary objections not expressly ruled on at the time of decision on a summary judgment motion preserved for appeal?"—in a case arising from this court. (*Reid v. Google, Inc.* (2007) 155 Cal.App.4th 1342 [66 Cal.Rptr.3d 744], review granted Jan. 30, 2008, S158965.) Until we receive guidance from the California Supreme Court, the prevailing view in the summary judgment context appears to be "that a trial court presented with timely evidentiary objections in proper form must expressly rule on the individual objections, and it if does not, the objections are deemed waived and the objected-to evidence included in the record." (*Demps v. San Francisco Housing Authority* (2007) 149 Cal.App.4th 564, 578 [57 Cal.Rptr.3d 204]; cf. *Vineyard Springs Estates v. Superior Court* (2004) 120 Cal.App.4th 633, 642–643 [15 Cal.Rptr.3d 587].)

Plaintiffs rely on *Vineyard Springs Estates v. Superior Court, supra,* 120 Cal.App.4th 633, as requiring that a trial court must rule on evidentiary objections. In that case, the appellate court issued a writ of mandate commanding the court "to rule on all evidentiary objections proffered by defendant . . . ." (*Id.* at p. 643.) That writ decision does not establish that the failure to expressly rule on an evidentiary objection at a hearing on a motion for attorney fees and costs is prejudicial or reversible per se on appeal. At best, plaintiffs' repeated requests for a ruling on their objections may be regarded as preserving their objections on appeal. (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1580 [31 Cal.Rptr.3d 368].) Contractor asserts that the court's conclusions can be upheld without reliance on this declaration, so we will disregard it.

## C. The Need for a Formal Motion to Tax Costs

On appeal, plaintiffs renew their contention that contractor has forfeited any objections to plaintiffs' claim for costs by failing to file a motion to tax costs. They appear to have overlooked that contractor's opposition to their motion was entitled "opposition . . . or in the alternative motion to tax fees and costs." (Capitalization omitted.)

In this case, the settlement agreement provided in part that "Plaintiffs' claim for attorneys' fee and costs (including 'Stearman' costs) shall be

submitted to the court by appropriate motion . . . ." "Plaintiffs shall have 75 days from their receipt of a copy of this Agreement that has been fully and validly executed by all Settling Parties in which to file their motion for recovery of attorneys' fees and costs." While the agreement did not specify how contractor should oppose plaintiffs' claims, the agreement contemplated there would be some type of opposition which the trial court would resolve.

As noted above, plaintiffs filed a motion for attorney fees and costs that was accompanied by a cost memorandum. The motion requested recovery of costs totaling $343,516.72, greater than the amount itemized in the cost memo. The attached Hansen declaration stated, "The total amount of fees and costs recited in paragraph 3 of this declaration includes $266,561.96 in statutory costs that are itemized on the Memorandum of Costs that is being filed concurrently herewith."

There is no statute requiring the filing of a motion to tax costs. Section 1034, subdivision (a) provides that "costs allowable under this chapter shall be claimed and contested in accordance" with the California Rules of Court. In 2006, when plaintiffs' motion for fees and costs was heard, California Rules of Court, former rule 870 (now rule 3.1700) provided that a "prevailing party who claims costs shall serve and file a memorandum of costs" and that any "notice of motion to strike or tax costs shall be" timely filed and served. Former rule 870(b)(2) provided (as does rule 3.1700(b)(2) now): "Unless objection is made to the entire cost memorandum, the motion to strike or tax costs must refer to each item objected to by the same number and appear in the same order as the corresponding cost item claimed on the memorandum of costs and must state why the item is objectionable."

While contractor's opposition to plaintiffs' motion was alternatively entitled a motion to tax costs, contractor did not specify objectionable line items in the cost memo, but then again, $76,954.76 of plaintiffs' claimed costs (22 percent) were not itemized in this memo, so no such objection could be made to them. We consider it clear enough from contractor's opposition what cost claims contractor objected to. We perceive no prejudice to plaintiffs, or even a claim of prejudice, from the absence of a more formal motion to tax costs. (Cf. *California Recreation Industries v. Kierstead* (1988) 199 Cal.App.3d 203, 209 [244 Cal.Rptr. 632] [no prejudice because plaintiffs sought attorney fees by memorandum of costs instead of noticed motion when defendants successfully objected to plaintiffs' claims at ensuing hearing].)

Contractor argues that the parties "agreed to forego the usual procedure for determining costs, and agreed to resolve the issue by way of a motion filed by" plaintiffs. Plaintiffs dispute that they had such an agreement, but they offer no other explanation for why they requested $76,954.76 in

costs that they did not itemize in their cost memo. Usually, the omission of an item from a cost memo may be regarded as a waiver of the prevailing party's claim to that item. (*Hotchkiss v. Smith* (1895) 108 Cal. 285, 286–287 [41 P. 304]; *Sepulveda v. Apablasa* (1938) 25 Cal.App.2d 381, 389 [77 P.2d 526]; cf. *Gerard v. Ross* (1988) 204 Cal.App.3d 968, 983–984 [251 Cal.Rptr. 604] [untimely memo].) Contractor here has not objected to any claimed costs on the procedural basis that they were not included in the cost memo.

Section 1032, subdivision (c) states in part: "Nothing in this section shall prohibit parties from stipulating to alternative procedures for awarding costs . . . ."[15] The wording of the settlement agreement and the subsequent conduct of the parties provided substantial evidence for the trial court to conclude that the parties had stipulated to an alternative procedure for awarding costs, dispensing with the usual formalities of a complete cost memo and a motion to tax costs. The trial court was justified in considering the merits of contractor's objections to plaintiffs' cost claims. We conclude there was neither error nor prejudice in the omission of a formal motion to tax costs.

## IV. The Merits of the Court's Awards

### A. *The Claimed Costs*

On appeal, plaintiffs challenge the court's award of costs of $142,432.46 as inadequate. In their briefs on appeal, plaintiffs asserted that they were only awarded 53 percent of their claimed costs of $266,561.96, the amount stated in their cost memo. This implied that plaintiffs were no longer seeking the additional $76,954.76 originally requested in their motion and supporting memorandum of points and authorities, though not in their cost memo. To better understand their contentions, by letter this court asked generally if plaintiffs were seeking costs not stated in their cost memo and specifically about certain costs. Plaintiffs have explained in a supplemental letter brief that they continue to seek costs not stated in their cost memo.

#### (1) *Statutory Costs*

After giving a brief overview of pertinent statutes, we will consider separately contractor's objections by categories of costs. We look to the statutes because, as already noted, the settlement in this case provided in part "that plaintiffs are entitled to recover costs as authorized by law as if they were prevailing parties in the Action."

---

[15] Similarly, section 1033.5, subdivision (c)(5) provides for different methods for fixing attorney fees recoverable pursuant to a contract, "either upon a noticed motion or upon entry of a default judgment, unless otherwise provided by stipulation of the parties."

In *Davis v. KGO-T.V., Inc.* (1998) 17 Cal.4th 436 [71 Cal.Rptr.2d 452, 950 P.2d 567] (*Davis*), the California Supreme Court explained: "The 'costs' of a civil action consist of the expenses of litigation, usually excluding attorney fees. Under the common law rule, parties to litigation must bear their own costs. The right to recover any of such costs is determined entirely by statute. 'It is axiomatic that the right to recover costs is purely statutory, and, in the absence of an authorizing statute, no costs can be recovered by either party.' " (*Id.* at p. 439.)

Section 1032 provides in part: "(b) Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding."

*Davis* explained further: "Subsequent to the enactment of Government Code section 12965, the Legislature enacted Code of Civil Procedure section 1033.5, to expressly define the term 'costs' as used in Code of Civil Procedure section 1032, the principal statute governing the right of a prevailing party to recover costs. Code of Civil Procedure section 1033.5 specifies which costs are 'allowable' (*id.*, subd. (a)), which are 'not allowable . . . , except when expressly authorized by law' (*id.*, subd. (b)), and which may be allowed or denied in the court's discretion (*id.*, subd. (c))." (*Davis, supra*, 17 Cal.4th at p. 441.)

Section 1033.5, subdivision (c) provides in part that "(2) Allowable costs shall be reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation. [¶] (3) Allowable costs shall be reasonable in amount."

As this court explained in *Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 29–30 [69 Cal.Rptr.3d 678]: "In ruling upon a motion to tax costs, the trial court's first determination is whether the statute expressly allows the particular item and whether it appears proper on its face. 'If so, the burden is on the objecting party to show [the costs] to be unnecessary or unreasonable.' (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131 [84 Cal.Rptr.2d 753].) Where costs are not expressly allowed by the statute, the burden is on the party claiming the costs to show that the charges were reasonable and necessary. (*Id.* at p. 132.) 'Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion.' (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 [23 Cal.Rptr.2d 810].)"

(A) *Costs of Attending Depositions*

Section 1033.5, subdivision (a) includes as allowable costs those involved in "(3) Taking, videotaping, and transcribing necessary depositions including

an original and one copy of those taken by the claimant and one copy of depositions taken by the party against whom costs are allowed, and travel expenses to attend depositions."

 Section 1033.5, subdivision (a)(3) clearly contemplates recovery of travel costs incurred by counsel to attend depositions. (*Foothill-De Anza Community College Dist. v. Emerich, supra*, 158 Cal.App.4th 11, 30.) By negative implication, this statute does not provide for recovery of local travel expenses by attorneys and other firm employees unrelated to attending depositions (*Ladas v. California State Auto. Assn., supra*, 19 Cal.App.4th at pp. 775–776 (*Ladas*)) nor does it allow recovery for "meals eaten while attending local depositions." (*Id.* at p. 774.)

An attachment to plaintiffs' cost memo itemized a total of $68,288.36 for deposition costs under the headings of taking, transcribing, and travel. Contractor has objected to a small portion of those deposition costs. Contractor did not object to mileage travel costs of the Gorman firm identified in the firm's billings and in the cost memo. Contractor objected to 21 travel items totaling $572.65 listed in the billings of the Bowman firm. These objections were itemized in an attachment to a declaration by William Coggshall, an associate attorney in the Archer Norris firm, cocounsel for contractor.

As far as we can tell, some, but not all, of these Bowman attorney travel charges were catalogued in the cost memo as travel to depositions. For example, the cost memo listed four travel charges in December 2005 of $43.65, though the Bowman billings listed five charges of $43.65 for Daniel Smith traveling to four different depositions on five days that month. On the other hand, the cost memo listed five travel charges of $40.05, while the Bowman billings included only three charges in that amount. Contractor, presumably responding to the Bowman billings and not the cost memo, has challenged five charges of $43.65 and three of $40.05.

Contractor has challenged other travel charges that do not appear at all in the cost memo, though they were included in the Bowman firm's total costs of $6,283.76, and this total was included in the total costs for which recovery was sought in the motion and accompanying points and authorities. For example, charges of $31.11 for April 12, 2005, and $31.30 on July 27, 2005, were described as Smith going to meals with Gorman. There is also a travel expense of $35.64 for Attorney Parris Schmidt on August 8, 2005, though his billing for his time on that date reflects only that he attended a deposition by telephone. There are other travel expenses for Schmidt from August 18, 2005, totaling $44.45, when his billing reflects no work on this case between August 11 and 22, 2005. There are two travel charges of $4.85 attributed to W. Noori on September 20 and 26, 2005, when it does not appear any deposition was taken.

On appeal, plaintiffs do not disavow an interest in recovering all these costs, whether or not identified accurately or at all in their cost memo. Instead, they renew the claim from their reply memo that "many of the items that [contractor] challenged are made 'recoverable' under CCP § 1033.5 (such as deposition fees, travel and meals related to depositions, and deposition fees paid to an opposing litigant's expert)."

As to the costs related to attending depositions, it appears that plaintiffs made some attempt to segregate recoverable deposition costs, listed in their cost memo, from unrecoverable costs, such as meals and travel unrelated to attending depositions, but they have muddied the waters by also asking in their motion to recover unrecoverable costs. They continue on appeal to attempt to justify this broader request. Of the $572.65 challenged by contractor, it appears that $420.45 was recoverable under section 1033.5, subdivision (a)(3), while the remaining $152.20 was not.

### (B) *Expert Deposition Fees*

The Bowman firm billings classified eight charges as expert deposition fees and one charge as simply a "deposition fee." Each charge was listed in the cost memo under the heading of the costs of taking depositions. Contractor objected to these nine charges totaling $3,414.06, though miscalculating their total.[16]

This court asked plaintiffs if they are seeking recovery of these amounts. Plaintiffs have responded as follows in a supplemental letter brief. "Despite the nomenclature used by the Bowman & Brooke accounting department in preparing billing statements, the 'expert fees' referenced by that law firm's bills are not for 'expert fees' within the meaning of the CCP and have not been claimed in the Memorandum of Costs as recoverable 'expert fees.'

---

[16] The Coggshall declaration in support of contractor's opposition inexplicably totaled the Bowman firm's deposition fees and travel costs as $2,550.30, when their actual total is $3,986.71, which is $1,436.41 higher. This wrong total was added to another amount objected to ($54,886.27 as explained in the following part) to support Coggshall's assertion, repeated in contractor's opposition, that plaintiffs were seeking "$57,436.57" in unrecoverable costs, an amount also $1,436.41 too low, if contractor's other addition was accurate. To compound the confusion, the parties have adopted these miscalculated totals as premises for their further arguments, in Attorney Hansen's second declaration in the trial court, and in their supplemental letter briefs on appeal.

Contractor's challenge on this topic targeted the Bowman firm's billings. Contractor did not specifically object to another four charges, totaling $1,427.68, also listed in the cost memo under the heading of the costs of taking depositions, and characterized in the Gorman firm's billings as consisting of expert fees of $600 and $140.63, deposition fees of $337.05, and a deposition interpreter fee of $350. We note that what the Gorman billings also characterized as deposition fees were later described in the cost memo as the costs of transcribing the depositions.

However, such amounts are claimed in the Memorandum of Costs as recoverable deposition costs." "These fees had to be paid as part of the deposition process and are statutorily recoverable costs related to the taking of the depositions under Cal. Civ. Proc. Code [*sic*] § 1033.5(a)(3)." Plaintiffs explained that these fees compensated defense experts for their time while being deposed.

 Regarding the recovery of expert witness fees as costs, the California Supreme Court has explained: "Allowable costs include ordinary witness fees and the fees of experts *ordered by the court*, so long as they are 'reasonably necessary' to the conduct of the litigation and 'reasonable' in amount. (Code Civ. Proc. 1033.5, subds. (a)(7) & (8), (c)(1), (2) & (3).) Nonallowable costs include fees of experts not ordered by the court, 'except when expressly authorized by law.' (*Id.*, 1033.5, subd. (b)(1).)" (*Davis, supra*, 17 Cal.4th 436, 441.) *Davis* concluded generally "that the fees of experts not ordered by the court are not an allowable item of costs . . . ." (*Id.* at p. 446.) *McGarity v. Department of Transportation* (1992) 8 Cal.App.4th 677 [10 Cal.Rptr.2d 344] more specifically concluded that expert deposition fees are not recoverable under the costs statute. (*Id.* at p. 686; cf. *Baker-Hoey v. Lockheed Martin Corp.* (2003) 111 Cal.App.4th 592, 599–602 [3 Cal.Rptr.3d 593] (*Baker-Hoey*) [costs incurred in deposing treating physicians are not recoverable].)

Absent evidence or even an argument that these defense experts were ordered by the court, plaintiffs were not entitled to recover their deposition fees.

(C) *Postage, Photocopying, and Related Fees*

Shifting its focus to the billings of the Gorman firm, contractor also objected to what it calculated to be $54,886.27 in nonrecoverable costs identified as for photocopying, postage, faxing, and Federal Express.[17]

 Section 1033.5, subdivision (b) provides that the following costs are not recoverable "except when expressly authorized by law: [¶] . . . [¶]

---

[17] This amount was also calculated in an attachment to Attorney Coggshall's declaration. This was a component of the $57,436.57 total that we explained above (see, *ante*, fn. 16) was miscalculated. Though Coggshall incorrectly added 30 items of deposition fees and travel expenses, we have not attempted to verify his addition of the approximately 140 items included in this total of $54,886.27.

For unknown reasons, contractor did not separately object to or total the much lesser copying charges included in the Bowman firm billings, and we will not undertake to calculate that total, though it was included in the Bowman firm's total costs for which plaintiffs sought recovery.

(3) Postage, telephone, and photocopying charges, except for exhibits." Interpreting this statute, *Ladas, supra*, 19 Cal.App.4th 761 concluded that it also precludes recovery for faxing documents. (*Id.* at p. 775; cf. *Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1627 [28 Cal.Rptr.2d 878] ["the expenses of copying documents, Federal Express and postage charges, and telecopy/fax charges" "are expressly disallowed as costs unless expressly permitted by law"].) On the other hand, overnight messenger fees may be recoverable if reasonable and necessary. (*Foothill-De Anza Community College Dist. v. Emerich, supra*, 158 Cal.App.4th 11, 30.)

■ In response to contractor's objection, plaintiffs argued in their opening brief, as they did in their reply memo, that "many" of the challenged items are recoverable and that these expenses were "necessarily incurred to comply with various pretrial orders, such as the cost of placing copies of documents, photos, and videos into a document depository. Costs incurred to comply with a court order can be recovered under CCP § 1033.5(c)(4). See, e.g., Gibson v. Bobroff, 49 Cal.App.4th [1202] [57 Cal.Rptr.2d 235] (1996) (mediation fees); Winston Square Homeowners Association v. Centex West, Inc., 213 Cal.App.3d 282 [261 Cal.Rptr. 605] (1989) (special master fees); Gardiana v. Small Claims Court, 59 Cal.App.3d 412, 421–22 [130 Cal.Rptr. 675] (1975) (interpreter fees)." As we will soon explain, plaintiffs are seeking a discretionary award of these costs.

We asked plaintiffs essentially to quantify how many of these challenged items they seek to recover. By supplemental letter brief, they have directed us to a supplemental second declaration by Hansen in support of plaintiffs' motion for attorney fees and costs, which stated: "To clarify, $2,079.62 of the challenged cost items are for 'photocopy' charges that were incurred to comply with the court's Pretrial Orders requiring that copies of documents [were] to be placed into a depository." The letter brief further explains, "Recovery of the remainder of the photocopy, postage, fax, and Federal Express charges and the like are sought to be recovered only under the 'tort of another' doctrine."[18]

It helps to have a number like $2,079.62 to work with. Unfortunately, the declaration did not explain how Hansen calculated this number or how it relates to costs listed in plaintiffs' cost memo. An "Item 13(a)" attachment to the cost memo provided two lists of charges, entitled "Reproduction of documents/plans/photos to depository per PTO" and "Reproduction of docs. placed into depository by other parties/experts per PTO." The total of these lists, which plaintiffs sought to recover, is $10,114.57, which is why we asked plaintiffs if they were seeking that amount or another amount. It is not clear

---

[18] We discuss plaintiffs' "tort of another" theory below (see, *post*, at p. 78) under nonstatutory costs.

what parts of that total plaintiffs are now disavowing, or whether they consider some of those amounts on these lists not to include photocopy charges.[19]

The statute (§ 1033.5, subd. (c)(4)), and two of the cases on which plaintiffs rely to recover these discretionary costs were discussed and distinguished in *Baker-Hoey, supra,* 111 Cal.App.4th 592, a case cited by neither side, where a party challenged the denial of recovery of the fees of a discovery referee. The following thorough discussion is directly relevant to plaintiffs' claims for the costs of document reproduction pursuant to court order. "The parties each cite *Winston Square Homeowner's Assn. v. Centex West, Inc., supra,* 213 Cal.App.3d 282. In that case, the trial court appointed a special master to control discovery and conduct settlement conferences. The prevailing party sought to recover the special master fees as costs under section 1033.5, subdivision (c)(4). That subdivision provides: 'Items not mentioned in this section and items assessed upon application may be allowed or denied in the court's discretion.'

"The *Winston* court said: 'A special master having been appointed by the court, his or her fee is analogous to the award of "[f]ees of expert witnesses ordered by the court." (§ 1033.5, subd. (a)(8); [citation].) The expense of court-appointed experts is first apportioned and charged to the parties, and then the prevailing party's share is allowed as an item of costs. [Citation.] [¶] The trial court acted well within the broad discretion granted to it by section 1033.5, subdivision (c)(4), when it allowed the special master fees as an item of costs.' (*Winston Square Homeowner's Assn. v. Centex West, Inc., supra,* 213 Cal.App.3d 282, 293.)" (*Baker-Hoey, supra,* 111 Cal.App.4th at pp. 602–603.)

*Baker-Hoey* continued on pages 603–604: "In addition to *Winston,* Lockheed Martin relied on *Gibson v. Bobroff*[*, supra,*] 49 Cal.App.4th 1202 . . . and *Applegate v. St. Francis Lutheran Church* (1994) 23 Cal.App.4th 361 [28 Cal.Rptr.2d 436]. [¶] In *Gibson,* the court relied on section 1033.5, subdivision (c)(4) to hold that an award of mediation expenses as costs was

---

[19] The attachment listed under the costs of reproducing documents an "ALC (Initial Deposit)" on January 31, 2005, of $2,741.78, and six supplemental deposits, all totaling $3,313.43. We cannot find any of these deposits reflected in the billings of the Gorman firm. However, the Gorman firm's billing for January 31, 2005, listed three "Photocopying charges" totaling $3,029.33. Adding two of these three charges yields a total of $2,741.78. We see no explanation in the record for how the identical amounts were spent on the same day for a deposit and for photocopying charges. There are several other charges listed on this attachment that we have been unable to correlate with any amounts in the Gorman firm billings.

The attachment also listed a charge of $415.25 on April 30, 2004, for "SJ Blue Print (Plans)." We see no explanation in the record for how this charge was incurred pursuant to a court order creating a document depository filed 87 days later on July 26, 2004.

not an abuse of discretion. (*Gibson v. Bobroff, supra*, 49 Cal.App.4th 1202, 1207–1210.) The court found that certain policy goals were furthered by such an award, and that the award of mediation expenses was reasonably necessary to the conduct of the litigation." (*Baker-Hoey, supra*, 111 Cal.App.4th at pp. 603–604.)

*Baker-Hoey* rejected claims that the costs of the discovery referee were recoverable as a matter of right under sections 1032 and 1033.5, subdivision (a), as they were neither expert witness fees ordered by the court, motion fees, nor deposition fees. (*Baker-Hoey, supra*, 111 Cal.App.4th at p. 604.)

█ The court continued: "However, as the foregoing cases hold, the fees of a special master can properly be awarded as costs under the broad discretion given to the trial court under section 1033.5, subdivision (c)(4). (*Winston Square Homeowner's Assn. v. Centex West, Inc., supra*, 213 Cal.App.3d 282, 293.) In such a case, the costs must be 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation' and must be 'reasonable in amount.' (§ 1033.5, subd. (c)(2) & (3).) While we agree with Lockheed Martin that the payment of the fees was, in view of the court's reference order, necessary to the conduct of the litigation, that does not end the matter.

"The real issue is whether the trial court abused its discretion in allocating such fees in accordance with the original reference order instead of allowing Lockheed Martin to recover its share of such fees as costs.

"We cannot find an abuse of discretion. As *Winston* notes, the trial court's discretion is broad." (*Baker-Hoey, supra*, 111 Cal.App.4th at pp. 604–605.) The appellate court reasoned that the trial court was well situated to determine whether the referee's fees to attend depositions were reasonably necessary. "The trial court may have found that the discovery referee's fees should be divided equally because they were not reasonably necessary to the conduct of the depositions, or because the parties were equally responsible for the conditions which led to the need for such close supervision of the deposition process. Or, as the trial court indicated at the beginning of its discussion, it may have applied an overriding reasonableness standard on a case-by-case and cost-by-cost basis under section 1033.5, subdivision (c)(3).

"The determination of reasonableness is peculiarly within the trial court's discretion. [Citation.] 'Whether a cost is "reasonably necessary to the conduct of the litigation" is a question of fact for the trial court, whose decision will be reviewed for abuse of discretion. [Citations.]' (*Gibson v. Bobroff, supra*, 49 Cal.App.4th 1202, 1209.)" (*Baker-Hoey, supra*, 111 Cal.App.4th at p. 605.)

In the trial court, when contractor objected that section 1033.5, subdivision (b)(3) precluded recovery of total costs of $54,886.27 identified

in the Gorman firm's billings as charges for photocopying, postage, faxing, and Federal Express, plaintiffs replied that $2,079.62 of that total was for photocopy charges incurred to comply with the court's pretrial orders providing for a document depository. Plaintiffs did not explain how this lesser amount related to the claim in their cost memo for a total of $10,114.57 in costs attributed to reproduction of depository documents per pretrial orders. In the trial court, plaintiffs acknowledged that awarding $2,079.62 was discretionary under section 1033.5, subdivision (c)(4).[20] In other words, plaintiffs virtually conceded that the remaining $52,806.65 was not recoverable as statutory costs.

As in *Baker-Hoey*, the real issue on appeal here is whether the trial court abused its discretion under section 1033.5, subdivision (c)(4) by denying plaintiffs' requests for photocopying expenses of $2,079.62 or the greater amount of $10,114.57, assuming it so ruled. Plaintiffs have cited cases that would have upheld such an award as within the trial court's discretion, but not cases requiring the trial court to exercise its discretion in their favor.

### (2) *Nonstatutory Costs*

#### (A) *The Tort of Another*

While virtually conceding that $52,806.65 of their costs for photocopying, postage, faxing, and Federal Express are not recoverable as statutory costs, plaintiffs seek to recover them (presumably as well as all their other nonstatutory costs) as damages under the "tort of another" doctrine. The Restatement Second of Torts provides in section 914: "(1) The damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation. [¶] (2) One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."

■ California has adopted this exception to the general American rule that parties bear their own attorney fees and costs in tort actions. (*Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645] (*Prentice*); *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505, 507–508 [198 Cal.Rptr. 551, 674 P.2d 253].) As stated in *Prentice*, "A person who through the tort of another has been required to act

---

[20] Likewise, the other costs requested on the "Item 13(a)" attachment to the cost memo, to which contractor did not object, were also discretionary under section 1033.5, subdivision (c)(4), namely $15,694.54 for the fees of the special master, $987.16 for mediation fees, and $200 for a document depository administrative fee.

in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Prentice, supra*, 59 Cal.2d at p. 620.) "In the usual case, the attorney's fees will have been incurred in connection with a prior action; but there is no reason why recovery of such fees should be denied simply because the two causes (the one against the third person and the one against the party whose breach of duty made it necessary for the plaintiff to sue the third person) are tried in the same court at the same time." (*Id.* at p. 621.)

Plaintiffs advanced this theory in their motion to justify recovering all their attorney fees and costs involved in litigating with the subcontractors. Contractor responded that the theory did not apply. Plaintiffs persisted in their reply memo in the trial court. Their opening brief does not appear to have renewed this contention. It was not stated as an argument under a separate heading as required by California Rules of Court, rule 8.204(a)(1)(B), but merely in a footnote and another passage reciting the procedural history. Not surprisingly, as plaintiffs' reply brief observed, contractor's "brief does not address the 'tort of another' doctrine." Plaintiffs have belatedly argued in their reply brief and their supplemental letter brief that the doctrine could justify their recovery of fees and costs involved in litigating with subcontractors. Contractor has responded to this argument in its supplemental letter brief.

As noted above (see, *ante*, fn. 11), a party seeking to recover attorney fees and costs as tort damages ordinarily should plead and prove them to the fact finder, and not in a posttrial or postsettlement cost memo. The California Supreme Court has stated in *Hsu v. Abbara, supra*, 9 Cal.4th 863, in footnote 4 on page 869: "Unless the parties stipulate otherwise, a claim for attorney fees under the 'tort of another' doctrine may not be asserted by post-trial motion but rather must be pleaded and proved to the trier of fact. (*Brandt* v. *Superior Court* (1985) 37 Cal.3d 813, 819 [210 Cal.Rptr. 211, 693 P.2d 796]; *Vacco Industries, Inc.* v. *Van Den Berg* (1992) 5 Cal.App.4th 34, 56 [6 Cal.Rptr.2d 602].)"

Contractor has not asserted this procedural bar and has not questioned whether plaintiffs' 50-page second amended complaint contained any allegation that contractor's negligence has caused plaintiffs to incur attorney fees and costs in litigation with third parties such as subcontractors. In the trial court, contractor asserted a failure of proof, pointing to plaintiffs' failure to offer evidence either that contractor or its subcontractors were negligent or that any negligence by contractor caused plaintiffs to sue subcontractors "to protect their interest as a result of the breach." While contractor did agree to pay plaintiffs money in a settlement, the settlement also provides that it "does

not include or constitute an admission of any fact, or of liability or fault by any Party regarding any fact, claim, allegation, issue of law or violation of law. . . . This agreement may not be used as evidence of any wrongdoing, misconduct or liability by any Party or anyone else." The fact of contractor's settlement cannot be used as an admission of its negligence.

In the trial court, plaintiffs claimed that they proved the negligence of contractor and the subcontractors through the declarations of their experts. For example, John Holland, a principal of J. Holland Corporation and the Naftzger-Holland Group Inc., declared that he had been involved in destructive testing at the residence and he had discovered "multiple leaks resulting in extensive water damage; toxic mold; major structural and seismic deficiencies; excessive stucco cracking and installation problems; inadequate, inoperable, and in some cases nonexistent HVAC and plumbing systems; uneven and improperly installed floors and floor bowing; roofing and roof ventilation [*sic*]; misframed and out of plumb walls and rooms; damaged windows, damaged window frames, and improperly installed windows; the presence of standing water in the house's crawl space; missing insulation and sealing of penetrations; and overall shoddy workmanship. . . . In my professional opinion, Tassajara, as the general contractor, was responsible for the project as a whole and has or shares responsibility for the myriad of problems that exist."

If the trial court accepted this declaration (and similar ones) as expert testimony, it provided evidence of negligent workmanship by contractor and its subcontractors. The declaration did not prove or attempt to prove that contractor's negligence caused plaintiffs to litigate with the negligent subcontractors. Moreover, we see no attempt by plaintiffs to segregate their costs of litigating with subcontractors from their costs of litigating with contractor. The tort of another doctrine does not allow a party to recover the fees and costs involved in litigating directly with a negligent defendant. (*Pederson v. Kennedy* (1982) 128 Cal.App.3d 976, 980 [180 Cal.Rptr. 740].)

The biggest problem with this claim, however, as contractor asserts in its supplemental letter brief, is that the tort of another doctrine does not apply to the situation where a plaintiff has been damaged by the joint negligence of codefendants. *Vacco Industries, Inc. v. Van Den Berg, supra,* 5 Cal.App.4th 34 stated at page 57: "The rule of *Prentice* was not intended to apply to one of several joint tortfeasors in order to justify additional attorney fee damages. If that were the rule there is no reason why it could not be applied in every multiple tortfeasor case with the plaintiff simply choosing the one with the deepest pocket as the '*Prentice* target.' Such a result would be a total emasculation of Code of Civil Procedure section 1021 in tort cases."

We will assume for the sake of discussion that the initial contract entered into by the parties, or their settlement agreement, authorized plaintiffs to plead and prove in a postsettlement motion that they were damaged as a result of contractor's negligence by incurring attorney fees and costs involved in litigating with subcontractors in this action.[21] Setting aside this procedural question, plaintiffs have made no attempt to prove what costs or fees were involved in litigating with subcontractors, as opposed to litigating with contractor. More importantly, to the extent they have supplied evidence of negligence, they have established that they were damaged by the combined negligence of contractor and its subcontractors. We see no evidence that plaintiffs named subcontractors as defendants in this action as a result of contractor's negligence, as opposed to subcontractors' own negligence. Even assuming that the parties have stipulated to litigate tort of another damages by way of a postsettlement motion, that doctrine does not reach so far as to allow plaintiffs to pick and choose which one of several joint tortfeasors should absorb the costs of the plaintiffs litigating with the other tortfeasors. We conclude that the tort of another theory does not apply to justify plaintiffs' recovery of costs as damages under these circumstances.

### (B) "Stearman *Costs*"

Regarding the costs aspect of the trial court's award, the biggest number in dispute is plaintiffs' claim in an "Item 13(b) Attachment" to their cost memo of $165,683.09 for what the parties have chosen to characterize as " 'Stearman['] costs." This item alone exceeds the costs awarded by $23,250.63.

The settlement agreement provided in part: "Tassajara agrees that Plaintiffs shall be permitted to recover as 'costs' under this provision their expert, consultant, and other fees and costs that qualify as 'Stearman' costs under the authority of Stearman v. Centex Homes, [*supra*,] 78 Cal.App.4th 611 . . . , in an amount to be determined by the court, and Tassajara agrees that it will not assert that Plaintiffs' 'Stearman' costs were or should have been included as a portion of the Initial Payment."

### (i) *Reviewing the* Stearman *Decision*

We review the opinion in *Stearman v. Centex Homes, supra,* 78 Cal.App.4th 611 (*Stearman*) to better understand the parties' agreement. In that case, after a jury trial, the plaintiffs recovered in strict liability for the defective

---

[21] We will explain below in part IV.B.(4) (see, *post*, beginning at p. 97), that the attorney fee provision in the construction contract did authorize the recovery of attorney fees, but not costs, pursuant to the tort of another theory. The provision says nothing about the procedure (whether by way of motion or trial) for recovering such fees.

construction of their residence against the defendant builder of mass-produced housing. On appeal, the plaintiffs contended "the trial court erred in denying them recovery of the costs and fees they incurred in employing 'geotechnical and structural experts to obtain and analyze soils samples and perform the necessary design calculations' to enable plaintiffs to determine 'an appropriate repair methodology to correct the defect.' They argue, 'These "investigative" costs were completely distinct from the "litigation" costs due these experts,' and were properly recoverable as part of the cost of repair." (*Stearman, supra,* 78 Cal.App.4th at p. 623.) The experts in that case had differentiated their billings between investigation and litigation and the defendant did not dispute their calculations. (*Ibid.*)

As we have already explained (see, *ante,* at p. 74), section 1033.5 precludes recovery of the fees of experts not ordered by the court. As the experts in *Stearman* were not ordered by the court, the appellate court concluded that their fees were not recoverable as costs under section 1033.5, subdivision (a)(8). (*Stearman, supra,* 78 Cal.App.4th at pp. 623–624.) The opinion continued, "Having eliminated any potential consideration of the expert witness fees as costs, plaintiffs contend they are entitled to recover the fees *as damages.*" (*Id.* at p. 624, italics added.) The defendant in *Stearman* conceded that "the cost of repair is the proper measure of damages in a construction defect case." (*Ibid.*) The appellate court agreed that these expert fees were recoverable as damages under "Civil Code section 3333[, which] provides, 'For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.' " (*Id.* at pp. 624–625; cf. *El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1362 [64 Cal.Rptr.3d 524].)

"The record is clear the court denied plaintiffs' motion, not because it doubted the credibility of the expert witnesses, but because it believed the law did not *allow* it to require defendant to pay the expert fees, even if they were incurred solely in relation to the costs of repair. The court was wrong. Plaintiffs were entitled to be made whole." (*Stearman, supra,* 78 Cal.App.4th at p. 625.) The appellate court found uncontradicted the testimony that the "plaintiffs were billed $37,500 by professionals who investigated the problems in order to formulate an appropriate repair plan . . ." and it ordered the court to include that amount in the judgment. (*Ibid.*)

We understand *Stearman* as extending established law. "[T]he general measure of damages where injury to property is capable of being repaired is the reasonable cost of repair together with the value of lost use during the period of injury." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 555 [87

Cal.Rptr.2d 886, 981 P.2d 978].) The cost of repair may include the cost of future repairs. (*Rovetti v. City and County of San Francisco* (1982) 131 Cal.App.3d 973, 980 [183 Cal.Rptr. 1].) But "repair costs are allowed only if they are reasonable . . . ." (*Orndorff v. Christiana Community Builders* (1990) 217 Cal.App.3d 683, 690 [266 Cal.Rptr. 193].) "The rule is established that the plaintiff has the burden of proving, with reasonable certainty, the damages actually sustained by him as a result of the defendant's wrongful act, and the extent of such damages must be proved as a fact." (*Chaparkas v. Webb* (1960) 178 Cal.App.2d 257, 259 [2 Cal.Rptr. 879]; cf. *Harris v. Los Angeles Transit Lines* (1952) 111 Cal.App.2d 593, 598 [245 P.2d 35] ["In personal injury actions, plaintiff may recover only for the necessary and reasonable expenditures attributable to the injury."].)

 Thus, just as the tort of another doctrine allows a party to recover as tort damages the attorney fees and costs involved in litigating with third parties as a result of the defendant's negligence, so *Stearman* authorizes the recovery of expert fees involved in repairing damaged property as tort damages, not costs, resulting from defective construction. We assume the parties in this case agreed to call these damages " 'Stearman' costs" for convenience, and we discuss them as nonstatutory costs.[22]

We note that the plaintiffs in *Stearman* sought only their experts' "investigative" costs, not their "litigation" costs. That case contains no explanation for this distinction and provides no guidelines for distinguishing one from the other. We assume that this limitation arises from the general rule that the expenses of litigation are ordinarily not considered tort damages.[23]

(ii) *Applying the* Stearman *Decision*

Presumably because the distinction was made in *Stearman*, the experts in this case have likewise attempted to differentiate their costs of investigating

[22] As quoted above, Hansen's initial declaration stated that among the total fees and costs sought was "$266,561.96 in *statutory* costs that are itemized on the Memorandum of Costs . . . ." (Italics added.) This amount included the " 'Stearman' costs." Even accepting that the parties agreed to call *Stearman* damages "costs," there is nothing "statutory" about this subtotal of $165,683.09.

[23] While these " 'Stearman' costs" are really damages, we note that section 1033.5, subdivision (b)(2) provides that "[i]nvestigation expenses in preparing the case for trial" are not recoverable costs.

In contrast, when a plaintiff declines a defendant's offer of compromise and later fails to obtain a more favorable judgment or award, the court, "in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (§ 998, subd. (c)(1).)

defects and formulating repair plans from costs of preparing for litigation. In their supplemental letter brief, "[p]laintiffs recognize that time spent by experts such as John Holland and the Naftzger-Holland Group drafting actual expert reports, preparing for and attending depositions, assisting plaintiffs' counsel in formulating discovery, attending mediations, working on declarations, etc. are not a type of <u>Stearman</u> cost." They claim "[a]ll such time was separated out and has <u>not</u> been included in any request for reimbursement."

The attachment to plaintiffs' cost memo identified the following components of their total claim of $165,683.09 for " 'Stearman' costs": $94,833.19 for plaintiffs' lead construction experts, John Holland and Jim Naftzger; $22,370.81[24] for Martin Morgan, a professional home inspector and the owner of All Bay Home Inspection, Inc., and All Bay Development Corporation; $22,094.21 for Richard Holm, a licensed structural engineer employed by Cecil H. Wells Jr. & Associates; $4,145.62 for Ed Brady, a licensed mechanical engineer who investigated HVAC (heating, ventilating, and air-conditioning) and water system problems; $3,217.50 for Kregg Karpowich, owner of Menlo-Atherton Plumbing; and $1,880.35 for Mark Hunter, who investigated plumbing and water system problems. Also included in the total was another $17,141.41, explained in the initial Hansen declaration as billed by a dozen other individuals and entities.

The claim for " 'Stearman' costs" was supported by declarations by John Holland, Martin Morgan, Richard Holm, Ed Brady, Kregg Karpowich, Mark Hunter, and Attorney Hansen. In their declarations, Holland, Morgan, Holm, Brady, Karpowich, and Hunter each described what part of their total billings to plaintiffs represented their initial and ongoing investigation of construction problems and their formulating and revising possible repair plans. For example, the total billings of the J. Holland Corporation and the Naftzger-Holland Group Inc. were $114,545.69. John Holland declared that "the amount attributable to investigation and analysis of the defects in plaintiffs' residence, formulating and revising repair plans and costs, and performing ongoing investigative work is $94,833.19." To compute this total, Holland went through the billings and indicated what work related partly or completely to "litigation preparation . . . ."

---

[24] Subsequent assertions by the parties have cast doubt on this subtotal. For reasons that do not readily appear, contractor's opposition to plaintiffs' motion asserted that plaintiffs were seeking $22,949.81 as *Stearman* damages" paid to Morgan. Plaintiffs' reply in the trial court adopted this number. Plaintiffs' briefs on appeal do not specify an amount sought for Morgan. In contractor's brief on appeal, it attributes $22,094.21 as damages invoiced by Morgan, when that amount was sought for a different expert. We will adopt as the amount sought for Morgan the $22,370.81 stated in the memorandum of costs and in Morgan's declaration.

Because the Gorman firm billings included virtually all of these experts' charges, including preparing for litigation,[25] we asked plaintiffs if they are seeking as " 'Stearman' costs" more than the $165,683.09 claimed in their cost memo. Their supplemental letter brief has clarified that they are only seeking the total stated in the cost memo.

### (a) *Inclusion of Homeowners' Repair Costs*

We now proceed to contractor's objections to these expert fees. The first contention is that large portions of some of these fees actually amounted to the cost of homeowners' repairs, for which plaintiffs were compensated by the initial payment of the settlement. For example, in answer to an interrogatory, plaintiffs prepared a list of "Homeowner Repair Costs" as damages totaling $155,507.21 that included 10 bills from All Bay Development totaling $59,822.07. Four of these invoices, dated February 23 and 28, May 28, and June 20, 2004, were also included as " 'Stearman' costs." A declaration by Martin Morgan, the owner of All Bay Development, explained that almost all of these four invoices, $22,370.81 out of a total of $25,610.25, reflected investigation and testing.[26]

As Hansen's second declaration (though not plaintiffs' briefs on appeal) pointed out, contractor has waived this contention in the settlement agreement. That agreement, not surprisingly, did not attempt to correlate defendants' initial payment of $2,430,000 with any particular damages claimed by plaintiffs during the litigation, but it does authorize plaintiffs to recover by way of motion their " 'Stearman' costs" "in an amount to be determined by the court" and it further provides that contractor "agrees that it will not assert that Plaintiffs' 'Stearman' costs were or should have been included as a portion of the Initial Payment." In other words, the settling parties clearly contemplated that the initial payment was not intended to cover plaintiffs' claims for " 'Stearman' costs," but instead preserved those claims for litigation and judicial resolution upon an appropriate motion and proof. That plaintiffs may have initially claimed as damages what they later called

---

[25] We say "virtually all" because the initial Hansen declaration mentioned that there was $1,166.30 in " 'Stearman' costs" in the cost memo that was not included on law firm invoices.

[26] Contractor has made a second objection to the four invoices from All Bay Development attached to Morgan's declaration. Contractor argues that plaintiffs should not be able to recover for Morgan's work because he is a friend of theirs who does not intend to charge them for his work as an expert. This argument is based on a deposition excerpt that appears to be limited, as plaintiffs assert, to Morgan's work in performing a home inspection. Morgan declared that he is the owner of both All Bay Home Inspection, Inc., and All Bay Development Corporation. The invoices in the record are from the latter company. Contractor falls short of establishing that plaintiffs have not actually incurred these charges. It is no defense that plaintiff has not yet paid a charge that has been incurred. (*Smith v. Gates Rubber Co.* (1965) 237 Cal.App.2d 766, 769–770 [47 Cal.Rptr. 307].)

" 'Stearman' costs" does not prove that their claims were covered by the initial payment of the settlement. In any event, contractor has waived this contention.

### (b) *Cutoff Dates for Planning Repairs*

Contractor's second objection is that after an expert has submitted a "final repair plan," any subsequent work cannot be attributed to formulating a repair plan. Contractor relies on Hansen's initial declaration, which stated: "Plaintiffs' lead construction experts, John Holland and Jim Naftzger (working with other of plaintiffs' experts) generated a formal repair plan on August 2, 2005" with an estimated cost of repairs of over $2 million. John Holland declared that he was deposed for five days beginning on August 16, 2005, and Jim Naftzger was deposed for four days beginning on August 8, 2005. They began preparing for their depositions on August 4, 2005, and almost all the work done by their companies prior to that date (except for a defense walkthrough on Sept. 10, 2004) was related to investigation of defects and possible repair options and preparation of a repair plan. Contractor calculated that, as of that date, Holland and Naftzger had billed only $37,323.25 of their ultimate investigative charges of $94,833.19 for formulating a repair plan.[27]

Likewise, at his deposition on December 6, 2005, Richard Holm stated that he had generated a list of structural defects on August 16, 2004. Contractor calculated that, by that date, Holm had billed plaintiffs $7,136.53 of his ultimate investigative charges of $22,094.21.

Plaintiffs respond that the formulation of repair plans by their experts was ongoing until the parties settled the case on May 15, 2006. A second declaration by Hansen stated that contractor "was well aware that additional investigation had been done (and that additional expert investigation expenses had been incurred) when it entered the settlement agreement." This argument is supported by the billings of the experts. For example, an invoice from the Naftzger-Holland Group Inc. dated March 13, 2006, reflects that an associate consultant was involved in formulating an estimate of repairs on February 23,

---

[27] While contractor has sought to limit " 'Stearman' costs" by generally suggesting that all expert work after certain dates was for litigation, we do not understand contractor to be questioning the efforts of the experts to differentiate their own investigation and litigation costs. Nevertheless, we cannot help but notice that John Holland's declaration classified the following as investigative work: 21 hours of Naftzger's time at $225 per hour between August 2 and November 1, 2004, spent on researching allegations, analyzing allegations, reviewing claims and allegations with client and counsel, and revising the claims and allegations; nine hours each of Holland's time (at $185 per hour) and Naftzger's time (at $200 per hour) on May 13, 2005, for consulting in connection with a settlement conference; and three hours of Naftzger's time at $225 per hour on July 25, 2005, in preparation for mediation. In so noting, we do not pretend to have thoroughly reviewed the experts' efforts at segregating their charges.

24, and 28, 2006, and that an estimate of repairs was completed on March 2, 2006. It stands to reason that, in the course of litigation over defective construction, an expert would prepare a preliminary estimate of needed repairs and would continue to refine and update that estimate as the litigation proceeded through repeated attempts at mediation and settlement.

### (c) *Evidentiary Support for Plaintiffs' Claims*

Contractor's third objection, targeting plaintiffs' claim for miscellaneous " 'Stearman' costs" of $17,141.41, is the lack of evidentiary support by declarations. Plaintiffs have responded that these amounts were all accounted for by two paragraphs in Attorney Hansen's initial declaration and attached supporting exhibits. Hansen's declaration described exhibit G as a compilation of "[c]opies of bills for investigative work by experts and consultants that are listed on the [Gorman firm's] billing statement but not attached to the declaration of other declarants . . . ."

*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641] set out applicable rules. "Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made, or that the charges were reasonable. [Citations.] If, however, a party testifies that he incurred or discharged a liability for repairs, any of these documents may be admitted for the limited purpose of corroborating his testimony [citations], and if the charges were paid, the testimony and documents are evidence that the charges were reasonable. [Citations.]" (*Id.* at pp. 42–43.)

None of the bills in exhibit G is referenced in the two declarations of John Gorman or the declaration of Jennifer Cheng, other than by a general statement that they have incurred $1,729,391.35 in attorney fees and costs "including expert and consultant expenses for investigation of problems with our residence."[28] Hansen specifically declared that the bills represented investigative work by experts and consultants.

Of this $17,141.41, perhaps the largest single component is billings by Forensic Analytical (each included on the Gorman firm's billings) totaling $4,360.86, including $650 on February 16, 2005, $1,530 on February 28, 2005, $203.06 on June 22, 2005, $75 on August 31, 2005, and $1,902.80 on May 30, 2006. Hansen's declaration attributed all these amounts to "mold testing and analysis," but almost all the charges in the final bill of $1,902.80 are itemized as being for Peter Kaminski reviewing the file, preparing for his

---

[28] These declarations were not amended to reflect the Gorman firm's admitted $65,000 overcharge.

deposition, and traveling to his deposition. Thus, Hansen's statement under penalty of perjury is incorrect,[29] as is plaintiffs' claim that they have separated out all expert time spent preparing for litigation.

### (3) *Reviewing the Cost Award*

We have reviewed in detail plaintiffs' claims for statutory and nonstatutory costs as authorized by the settlement agreement in this case and contractor's objections to their claims. Plaintiffs' motion sought a total cost award of $343,516.72, which included $266,561.96 itemized in a memorandum of costs that listed " 'Stearman' costs" of $165,683.09.

We have found no explanation of what costs make up the $76,954.76 difference between the cost memo and the total requested, but it appears that a major part of that represents plaintiffs' costs of photocopying, postage, faxing, and Federal Express.[30] It is our understanding that plaintiffs seek all costs not itemized in the cost memo as tort of another damages. Having rejected the application of that doctrine to the facts of this case, we are left with plaintiffs' cost memo claim for $266,561.96, which represents the total of five different categories of costs.

Contractor has offered no objection to three of those categories, namely the amounts of $1,556.20 for filing and motion fees, $150 for jury fees, and $3,888.04 for service of process. As to plaintiffs' claims in the fourth category of deposition costs, out of a total request for $68,288.36, contractor has objected to expert deposition fees of $3,414.06 and attorney travel expenses of $576.65. We have concluded above that $420.45 of these travel expenses appears to be recoverable under section 1033.5, subdivision (a)(3), while the remaining objections are well taken.

In the "other" category of the cost memo, plaintiffs requested total costs of $192,679.36, which included the claim for " 'Stearman' costs," as well as document reproduction costs of $10,114.57, special master fees of $15,694.54, mediation fees of $987.16, and a document depository fee of $200. Contractor did not object to a discretionary cost award of these other costs totaling $16,881.70, apart from the photocopying costs and parts of the " 'Stearman' costs."

---

[29] We have not scrutinized all 30 pages of the invoices and summaries included in exhibit G for additional discrepancies.

[30] While contractor calculated that the Gorman firm billings included $54,886.27 for photocopying, postage, faxing, and Federal Express, plaintiffs had included in their cost memo only $10,114.57 for reproducing documents. This leaves $44,771.70 as not included in the cost memo. As noted above (see, *ante*, fn. 19), there is no absolute correlation between these amounts, as we have been unable to find some of the listed costs of reproduction documented in the Gorman firm billings.

As to the " 'Stearman' costs," plaintiffs did not dispute the charges of $1,880.35 for Mark Hunter or $3,217.50 for Kregg Karpowich. Even with their objections, they agreed that plaintiffs were entitled to recover $37,323.35 for John Holland and Jim Naftzger and $7,136.53 for Richard Holm. Thus, contractor has made no objections to a " 'Stearman' costs" award of $49,557.73 out of the $165,683.09 requested.

Contractor asked for sizable reductions in the fees of Holland and Naftzger ($94,833.19) and Holm ($22,094.21) on the basis that their repair plans were finalized at an early stage of the litigation. We have questioned the logic and evidentiary support for this objection. Contractor objected to almost all the fees of Martin Morgan for $22,370.81 and Ed Brady for $4,145.62 as already included in homeowners' repairs. We have concluded above that contractor waived this argument in the settlement agreement.

If the trial court had sustained every one of contractor's objections to the costs sought in the cost memo, even those we find invalid, it would have awarded $136,345.32. The difference between this amount and the amount awarded, $142,432.46, is $6,087.14. Thus, the trial court must have overruled at least some of contractor's objections. There is no indication in the record of what objections, if any, the trial court considered meritorious. Assuming that the trial court recognized the invalidity of the objection to $420.45 of the travel expenses, the award would have been $136,765.77, or $5,666.69 less than the actual award. Assuming the trial court recognized that contractor had waived its main objection to the fees of Morgan and Brady, the award would have been $163,282.20, or $20,849.74 more than the actual award. It is also conceivable that the trial court realized that, despite the lack of objection to them, the special master fees of $15,694.54, the mediation fees of $987.16, and the document depository fee of $200 were as discretionary as the document reproduction costs, which were initially totaled to be $10,114.57, later reduced to $2,079.62. Including a discretionary award of either $10,114.57 or $2,079.62 does not explain the difference between the unchallenged costs and the court's award.

We could prolong this opinion by adding and subtracting other numbers, but we believe our point is made. Despite long study of the motion and opposition, we have been unable to find a combination of numbers adding up to the precise cost award of $142,432.46. Since we are reversing the judgment on another ground, the trial court will have another opportunity to redetermine the cost award consistent with our above observations regarding the contentions of the parties.

### B. The Claim for Attorney Fees

We repeat, the settlement agreement provided in part: "In addition to the Initial Consideration set forth above, Tassajara and its insurers shall pay to Plaintiffs such amount as the court determines to be reasonable attorneys' fees and costs (including reasonable expert and consultant fees) as may be allowed pursuant to the Construction Contract or as otherwise permitted by law ('Second Payment'). Notwithstanding that this is a settlement and that the matter has not proceeded to final judgment, it is agreed that Plaintiffs shall be deemed to be the 'prevailing parties' in the Action solely for the purpose of invoking plaintiffs' rights to recover attorneys' fees and costs pursuant to the terms of the Construction Contract and that plaintiffs are entitled to recover costs as authorized by law as if they were prevailing parties in the Action. Plaintiffs' claims for attorneys fees and costs under this provision shall extend up to but no later than the date that this Agreement becomes binding based upon plaintiffs' receipt of a copy of this Agreement that has been fully and validly executed by all Settling Parties. In addition, it is agreed that Plaintiffs shall be permitted to seek recovery of any and all reasonable attorneys' fees and costs related to judicial determination of the amount of fees and costs that they are entitled to recover."

Plaintiffs contend on appeal that the trial court's award of attorney fees of $416,581.37 is entirely inadequate.

#### (1) The Amount of Attorney Fees Sought

It will help to identify what amount plaintiffs are requesting for attorney fees. In the trial court, plaintiffs sought $1,350,538.83 for all attorney fees, including both fees arising prior to the settlement and the fees involved in bringing the motion for fees. Their original motion requested presettlement fees of $1,341,337.83, but this request was reduced by $65,000 to $1,276,337.83 after contractor's opposition pointed out an overstated billing item.[31] Plaintiffs also asked for fees of $43,337.50 for filing their initial motion for attorney fees and later requested another $30,827.50 for filing a reply to contractor's opposition. Of these motion fees, $2,208 represented work by the Bowman firm and the balance of $71,990 was for the Gorman firm's work.

Of the presettlement fees, $1,095,202.75 was charged by the Gorman firm. Contractor has calculated that those fees include $664,094.50 for 1,780 hours

---

[31] The 275-page billings submitted by the Gorman firm included an apparent typographical error showing Associate Attorney Craig Hansen to have spent 260 hours on January 6, 2005, at $250 per hour reviewing a letter from opposing counsel at a total charge of $65,000. After contractor pointed this out, plaintiffs agreed to deduct this amount from their claim, and we will accordingly reduce their claimed totals.

of Gorman's time, at rates of $350 per hour in 2004, $375 per hour in 2005, and $400 per hour in 2006. The other presettlement fees sought by the Gorman firm were mostly for hours spent by associate Craig Hansen, whose rates increased from $250 per hour in 2004 to $260 per hour in 2005 and $280 per hour in 2006. Some paralegal work is also included in the total.

The other non-Gorman-firm presettlement fees sought, a total of $181,135.08, include $2,762.50 charged by Bruce Janke, $7,040.58 charged by Semha Alwaya,[32] and $171,332 charged by the Bowman firm. The attorneys at the Bowman firm who billed plaintiffs were Daniel Smith, who charged $250 an hour, and two associates, who charged $200 an hour. A declaration by Smith included the claim that their rates are reasonable for the kind of work they did within the Santa Clara County legal community. In a second declaration, Smith explained that his construction practice is primarily defense work, which charges lower rates than do plaintiffs' counsel. A supplemental declaration by Hansen explained that he used to work at the Bowman firm, and they primarily do defense work for large corporations and insurance companies who negotiate rates for handling cases in bulk. The Gorman firm's rates are what they usually charge other clients. The Gorman firm had handled a number of construction cases at those rates.

### (2) *Scope of the Trial Court's Discretion in Awarding Attorney Fees*

We have already quoted above (see, *ante*, pt. III.A.(3)) in some detail California Supreme Court authority pertaining to awarding attorney fees. We have also concluded that trial courts are not obliged in every case to expressly acknowledge the lodestar amount or to specifically itemize those fee claims they find to be unnecessary or unreasonable.

 *EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770 [75 Cal.Rptr.3d 902] provides a focused summary of the law on page 774. "Except as provided for by statute, compensation for attorney fees is left to the agreement of the parties. (Code Civ. Proc., § 1021.) Civil Code section

---

[32] A table attached to Hansen's initial declaration as exhibit A listed Alwaya's fees as $7,040.58. Hansen's declaration stated that she billed $7,109.32. The difference between these two amounts is $68.74, which is the amount of costs listed in Alwaya's five attached invoices.

A close study of her invoices shows that her total fees were $4,600. Hansen's calculation of $7,109.32 included an unpaid balance of $1,525 from the first invoice included on her second invoice, and an unpaid balance of $915.58 included on her third invoice, while leaving off the unpaid balances listed on the fourth and fifth invoices. This calculation double-charges for some of her time and costs. Due to this error, plaintiffs' total of $1,350,535.83 is too high by $2,440.58. We will continue to use their total as the amount they claim.

In its supplemental letter brief, contractor calculates that plaintiffs are really seeking attorney fees of $1,350,044.55. They derive this lower result by counting Alwaya's fees as the higher amount of $7,109.32, but by leaving out the $560 representing two hours' time that Hansen estimated he had yet to spend on preparing for and attending the hearing on the motion.

1717 (section 1717) provides that reasonable attorney fees authorized by contract shall be awarded to the prevailing party as 'fixed by the court.' The trial court has broad discretion to determine the amount of a reasonable fee, and the award of such fees is governed by equitable principles. (*PLCM Group, Inc. v. Drexler*[, *supra*,] 22 Cal.4th 1084, 1094–1095 . . . (*PLCM*).) The first step involves the lodestar figure—a calculation based on the number of hours reasonably expended multiplied by the lawyer's hourly rate. 'The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.' (*Id.* at p. 1095.) In short, after determining the lodestar amount, the court shall then ' "consider whether the total award so calculated under all of the circumstances of the case is more than a reasonable amount and, if so, shall reduce the section 1717 award so that it is a reasonable figure." ' (*Id.* at pp. 1095–1096, quoting *Sternwest Corp. v. Ash* (1986) 183 Cal.App.3d 74, 77 [227 Cal.Rptr. 804] . . . .) The factors to be considered include the nature and difficulty of the litigation, the amount of money involved, the skill required and employed to handle the case, the attention given, the success or failure, *and other circumstances in the case.* (*PCLM*, at p. 1096.) The 'necessity for and the nature of the litigation' are also factors to consider. (*Kanner v. Globe Bottling Co.* (1969) 273 Cal.App.2d 559, 569 [78 Cal.Rptr. 25] [appellate court affirmed award of fees reduced by trial court].) We will reverse a fee award only if there has been a manifest abuse of discretion. (*PLCM, supra*, at p. 1095.)"

■ Some courts have approved including paralegal fees as attorney fees. (Cf. *Guinn v. Dotson* (1994) 23 Cal.App.4th 262, 268 [28 Cal.Rptr.2d 409]; see *Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 274 [237 Cal.Rptr. 269].)

"At the same time, discretion must not be exercised whimsically, and reversal is appropriate where there is no reasonable basis for the ruling or the trial court has applied 'the wrong test' or standard in reaching its result." (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1239 [66 Cal.Rptr.3d 680].) In *Press v. Lucky Stores, Inc., supra*, 34 Cal.3d 311, the California Supreme Court found "a palpable abuse of discretion" in a trial court's attorney fees calculation. (*Id.* at p. 324.) The trial court began with the proposed lodestar amount and multiplied it by the requested 1.5 enhancement, but then divided that total by 185, because the success of the lawsuit had generated 3,000 signatures out of the 556,000 needed to qualify an initiative for the ballot. (*Id.* at p. 323.) The Supreme Court concluded there was "no reasonable connection between the lodestar figure and the fee ultimately awarded . . . ." (*Id.* at p. 324.)

### (3) *An Attorney's Ability to Recover Fees for Representing Himself*

Of the total of $1,350,538.83 fees sought in this case, $1,167,192.75, about 86 percent, is sought by the Gorman firm. Of that subtotal, $664,094.50, about 57 percent, represents the legal work of plaintiff John Gorman, while the balance was for work done by associate Craig Hansen and paralegals. Whether Gorman and his wife are entitled to recover attorney fees for legal work by his law firm is a major issue in this case.

 It is settled that Gorman, the client, would not be able to recover contractual attorney fees had he been represented by Gorman, a sole practitioner. It is also settled that, if the Gorman firm had represented itself in litigation, it would not be able to recover for its own attorney fees. In *Trope v. Katz* (1995) 11 Cal.4th 274 [45 Cal.Rptr.2d 241, 902 P.2d 259] (*Trope*), the California Supreme Court considered "whether an attorney who chooses to litigate in propria persona rather than retain another attorney to represent him in an action to enforce a contract containing an attorney fee provision can nevertheless recover 'reasonable attorney's fees' under Civil Code section 1717 . . . as compensation for the time and effort expended and the professional business opportunities lost as a result." (*Id.* at p. 277.) The court's answer was "no" for the following reasons. "[T]he usual and ordinary meaning of the words 'attorney's fees,' both in legal and in general usage, is the consideration that a litigant actually pays or becomes liable to pay in exchange for legal representation. An attorney litigating in propria persona pays no such compensation." (*Id.* at p. 280.)[33]

Also, Civil Code section 1717 provides for recovery of fees "incurred" to enforce a contract. "[A]n attorney litigating in propria persona cannot be said to 'incur' compensation for his time and his lost business opportunities." (*Trope, supra*, 11 Cal.4th at p. 280.) The outcome of that case was dictated by the Supreme Court's interpretation of the statute. (*Id.* at pp. 279, 284, 288.) The court pointed out it would frustrate the intent of the statute to reward attorney-litigants, but no other type of litigants, for representing themselves. The statute "was designed to establish mutuality of remedy . . . ." (*Id.* at p. 285.) "If an attorney who is the prevailing party in an action to enforce a contract with an attorney fee provision can recover compensation for the time he expends litigating his case in propria persona, but a nonattorney pro se litigant cannot do so regardless of the personal and economic value of such time simply because he has chosen to pursue a different occupation, *every* such contract would be oppressive and one-sided." (*Id.* at pp. 285–286.)

This rule does not extend so far as to preclude an attorney who represents himself from recovering fees that he paid another attorney whom he retained

---

[33] We could all be millionaires if it amounted to income to retain a dollar taken from our own pockets. An attorney could become a millionaire by charging himself a million dollars for one hour of representing himself and considering himself paid. We would not expect him to object if he set this hourly rate.

to assist him in representing himself, though the retained attorney was not the attorney of record. (*Mix v. Tumanjan Development Corp.* (2002) 102 Cal.App.4th 1318, 1324–1325 [126 Cal.Rptr.2d 267].)

The application of *Trope* became an issue in *PLCM, supra,* 22 Cal.4th 1084, where the trial court awarded an insurance administrator contractual attorney fees for the work of its in-house counsel. The California Supreme Court noted that *Trope* itself had expressly declined to consider its application to in-house counsel. (*Id.* at p. 1093.) The court in *PLCM* concluded that none of the operative considerations in *Trope* applied "in the case of in-house counsel. There is no problem of disparate treatment; in-house attorneys, like private counsel but unlike pro se litigants, do not represent their own personal interests and are not seeking remuneration simply for lost opportunity costs that could not be recouped by a nonlawyer. A corporation represented by in-house counsel is in an agency relationship, i.e., it has hired an attorney to provide professional legal services on its behalf. Nor is there any impediment to the effective and successful prosecution of meritorious claims because of possible ethical conflict or emotional investment in the outcome. The fact that in-house counsel is employed by the corporation does not alter the fact of representation by an independent third party. Instead, the payment of a salary to in-house attorneys is analogous to hiring a private firm on a retainer." (*Ibid.*, fn. omitted.) "We discern no basis for discriminating between counsel working for a corporation in-house and private counsel engaged with respect to a specific matter or on retainer." (*Id.* at p. 1094.)

*Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510 [37 Cal.Rptr.3d 381] upheld an award of attorney fees on a special motion to strike to an attorney who was a named defendant for her work in the case. The appellate court determined that all the defendants had retained a special counsel who represented them on the successful motion to strike, while the attorney-defendant assisted with legal representation of other defendants who were her clients. (*Id.* at pp. 524–525.)

*Witte v. Kaufman* (2006) 141 Cal.App.4th 1201 [46 Cal.Rptr.3d 845] reversed an award of attorney fees to a law firm whose attorneys represented the firm in a successful special motion to strike. The court reasoned: "Here, unlike *PLCM Group* and *Gilbert,* but like *Trope,* there is no attorney-client relationship between KLA and its individual attorneys. The individual KLA attorneys are not comparable to in-house counsel for a corporation, hired solely for the purpose of representing the corporation. The attorneys of KLA are the law firm's product. When they represent the law firm, they are representing their own interests. As such, they are comparable to a sole practitioner representing himself or herself. Where, as in *Gilbert,* an attorney is sued in his or her individual capacity and he obtains representation from

other members of his or her law firm, those other members have no personal stake in the matter and may, in fact, charge for their work. Not so with a law firm that is sued in its own right and appears through various members." (*Id.* at p. 1211.)

Plaintiffs seek to distinguish *Trope* on several grounds. They assert that since the Gorman firm is incorporated, it is a separate legal entity from the individual John Gorman. John Gorman declared that he entered into written retainer agreements with "the law firms of Bowman & Brooke, LLP, Gorman & Miller, PC in connection with this action."

We recognize that the law allows for professional law corporations. (Corp. Code, § 13400 et seq.; Bus. & Prof. Code, § 6160 et seq.) In our opinion, the rationale of *Trope* applies to a lawyer who is representing himself in litigation, whether or not that lawyer has chosen to incorporate. Though his corporation may send the bill, the same person is the attorney and the client. When the client is also the chief executive officer, chief financial officer, and president of the corporation, there is the same lack of a true attorney-client relationship as with the members of the law firm representing the firm in *Witte v. Kaufman, supra,* 141 Cal.App.4th 1201.

Plaintiffs assert that there is an attorney-client relationship between the Gorman firm and Jennifer Cheng, Gorman's wife. She also declared that she entered into written retainer agreements with "the law firms of Bowman & Brooke, LLP, Gorman & Miller, PC in connection with this action."

We can certainly imagine cases in which a true attorney-client relationship exists between spouses. However, in this case, husband and wife sued for and obtained recovery for the defective construction of their residence. There is no indication that Cheng suffered any damages apart from those suffered by her husband. Their interests in this matter appear to be joint and indivisible. There is no claim that Gorman spent extra time in this case representing his wife in addition to the time he spent representing himself. There is no claim that each of them owes half his fees. Their community estate is liable for their contracts. (Fam. Code, § 910, subd. (a).) Since Gorman's billable hours appear to be entirely attributable to representing his common interests with Cheng, we conclude that the rule of *Trope* applies to this situation.

In the trial court, contractor objected to the recovery of any fees by the Gorman firm, whether billed by Gorman personally or his associate Hansen and paralegals. Contractor attempted to distinguish *Gilbert v. Master Washer & Stamping Co.* (2001) 87 Cal.App.4th 212 [104 Cal.Rptr.2d 461] (*Gilbert*) on several grounds. On appeal, plaintiffs assert that *Gilbert* is dispositive regarding the fees billed by Hansen and paralegals.

In *Gilbert*, the issue arose whether an attorney may recover reasonable attorney fees when he is represented by other members of his firm. The underlying case was a landlord-tenant dispute. The tenant complained that the landlord's attorney, Gernsbacher, had interfered with its recovery of the property. The attorney prevailed against this complaint, but the trial court ·denied his request for attorney fees. "The trial court found Gernsbacher was not entitled to attorney fees because he was represented by his own law firm, Gernsbacher & McGarrigle, APC, and did not present evidence he was 'obligated to pay' the legal fees incurred on his behalf by the attorneys representing him in this matter." (*Gilbert, supra*, 87 Cal.App.4th at p. 217.)

The appellate court in *Gilbert* found *Trope* distinguishable. "[A] member of a law firm who is represented by other attorneys in the firm 'incurs' fees within the meaning of Civil Code section 1717. Either the represented attorney will experience a reduced draw from the partnership (or a reduced salary from the professional corporation) to account for the amount of time his or her partners or colleagues have specifically devoted to his or her representation, or absorb a share of the reduction in other income the firm experiences because of the time spent on the case. This is different from the 'opportunity costs' the attorney loses while he or she is personally involved in the same case, because the economic detriment is caused not by the expenditure of his or her own time, but by other attorneys working on his or her behalf." (*Gilbert, supra*, 87 Cal.App.4th at p. 221.) "There can be no question an attorney-client relationship is also present where an attorney litigant is represented by other attorneys in his or her own firm." (*Id.* at p. 222.) Finally, there is no unfairness in allowing an attorney to recover for work done by others in his or her firm. "[L]ike a corporation represented by in-house counsel, the represented attorney seeks to recover fees for work done by others on his behalf. Indeed, it would be inequitable in the extreme to permit Gernsbacher to recover fees incurred by outside counsel, but deny him such recovery merely because his counsel are members of the same law firm as he." (*Id.* at p. 223.)

We do not understand contractor on appeal to renew its efforts to distinguish *Gilbert*. It argues only that "nothing in the *Gilbert* case supports the view that appellants in this case are entitled to recover fees for the work performed personally by appellant Gorman." We do not understand *Gilbert* to be limited to cases where the client is not the chief executive officer, chief financial officer, and president of the firm. We believe that *Trope* does not preclude the recovery of fees for other attorneys and paralegals hired by Gorman to represent him, even if they work in his law firm. (*Gilbert, supra*, 87 Cal.App.4th 212; *Mix v. Tumanjan Development Corp., supra*, 102 Cal.App.4th 1318, 1324–1325.)

It appears that the court's award of $416,581.37 for attorney fees included some of the fees claimed by the Gorman firm, as the total fees claimed for the Bowman firm, Janke, and Alwaya (accepting Hansen's miscalculation of her fees) was $183,346.08. To the extent the trial court disallowed recovery of any fees generated by Gorman personally, there was no error.

### (4) *Apportionment of Fees*

The construction contract between plaintiffs and contractor provided in part: "In the event of litigation between the parties, or if a party becomes involved in litigation because of wrongful acts of the other party, the prevailing party will be entitled to recover reasonable attorneys' fees."

In the trial court, contractor asserted that "under the plain language of the contract, Plaintiffs may only seek attorneys fees for the prosecution of their case against Tassajara." On appeal, contractor has apparently retreated from this narrow construction, arguing only that "it is quite reasonable, and certainly well within the discretion of the trial court, to apportion a fee award when there is more than one defendant." Plaintiffs argue that "the requested fees are not subject to allocation." (Underscoring & capitalization omitted.)

Plaintiffs argue for a broader construction of the attorney fee clause in the contract. We agree that it was broadly written. The language is reminiscent of an early phrasing of the tort of another doctrine. " ' "It is generally held that where the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as legal consequences of the original wrongful act and may be recovered as damages." ' " (*Beraksa v. Stardust Records, Inc.* (1963) 215 Cal.App.2d 708, 718 [30 Cal.Rptr. 504].) The agreement provided that, if contractor's wrongful act caused plaintiffs to become involved in litigation with third parties, contractor would be liable for plaintiffs' attorney fees in that litigation (and vice versa). The agreement essentially incorporated the tort of another doctrine as to the recovery of attorney fees.[34]

California law has recognized, in different contexts, that trial courts have discretion not only in setting the amount of an award of attorney fees, but in allocating the award among various defendants based on their relative

---

[34] This acknowledgment, that the contract provided for the recovery of *attorney fees* under the tort of another theory, casts no doubt on our conclusion above in part IV.A.(2)(A) that the tort of another doctrine does not apply in this case to authorize plaintiffs to recover the *costs* of litigating with third parties. The contract does not provide that the prevailing party "will be entitled to recover costs."

culpability. (*No Oil, Inc. v. Occidental Petroleum Corp.* (1975) 50 Cal.App.3d 8, 28–29 [123 Cal.Rptr. 589] [enforcing former California Coastal Zone Conservation Act of 1972]; see *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 986 [259 Cal.Rptr. 599] [fees under § 1021.5]; *Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 250–251 [261 Cal.Rptr. 520] [same].) *Washburn v. City of Berkeley* (1987) 195 Cal.App.3d 578 [240 Cal.Rptr. 784] noted on page 592: "[F]ederal courts have adopted various methods of apportioning or allocating fees among defendants in cases involving fee awards pursuant to 42 United States Code section 1988, and this court may look to federal law in applying section 1021.5. In *Grendel's Den, Inc.* v. *Larkin* (1st Cir. 1984) 749 F.2d 945 the court instructed, '[A] number of theories for apportioning fees have been advanced . . . . Among them are the simplest approach of dividing the award equally among the defendants . . . , and the more sophisticated approaches of apportionment by degree of each defendant's liability . . . , and apportionment by relative time spent litigating against each defendant. . . . Each of these theories may be more or less valid in a given case.' (*Id.,* at pp. 959–960.)"

Plaintiffs assert that the allocation of fees is a question that is reviewed de novo on appeal. They rely in part on *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101 [51 Cal.Rptr.2d 286], which states: "Apportionment of a fee award between fees incurred on a contract cause of action and those incurred on other causes of action is within the trial court's discretion . . . ." (*Id.* at p. 1111.) They also rely on *Korech v. Hornwood* (1997) 58 Cal.App.4th 1412 [68 Cal.Rptr.2d 637], which concluded, "We find the trial court acted well within its discretion, and we will not overturn its ruling." (*Id.* at p. 1423.) Their contention is unsupported by the precedent they invoke.

Because the trial court did not explain its award, we cannot determine to what extent, if any, it adopted contractor's suggestion to apportion only 41 percent of the total fees to contractor, parallel to the percentage of the total initial payment for which contractor was responsible.

### (5) *Reasonableness of Fees*

Contractor contends that "the trial court reduced the excessive amount of fees requested to a reasonable amount, within its sound discretion."

As this court noted in *Ajaxo Inc. v. E\*Trade Group, Inc.* (2005) 135 Cal.App.4th 21 [37 Cal.Rptr.3d 221], the burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable. (*Id.* at p. 65.) It is also plaintiffs' burden on appeal to prove that the court abused its discretion in awarding fees.

■ We have quoted at length above in part III.A.(3) (see, *ante*, beginning at p. 63) some of the California Supreme Court's guidance in awarding attorney fees. We emphasize the following. "Thus, applying the lodestar approach to the determination of an award under Civil Code section 1717, the Court of Appeal in *Sternwest Corp. v. Ash*[, *supra*,] 183 Cal.App.3d 74, 77 . . . explained: 'Section 1717 provides for the payment of a "reasonable" fee. After the trial court has performed the calculations [of the lodestar], it shall consider whether the total award so calculated under all of the circumstances of the case is more than a reasonable amount and, if so, shall reduce the section 1717 award so that it is a reasonable figure.' " (*PLCM, supra*, 22 Cal.4th 1084, 1095–1096.) "A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." (*Serrano IV, supra*, 32 Cal.3d 621, 635, fn. omitted.)

### (6) *Conclusions About the Attorney Fee Award*

In the trial court, plaintiffs ultimately requested attorney fees of $1,350,538.83, after reducing their claim by a $65,000 error in their favor. Eliminating $664,094.50 as contractor's calculation of the fees charged by Gorman to represent himself and his wife leaves a total of $686,444.33. As indicated above (see, *ante*, fn. 32), these totals came out to an odd number because, unremarked by the parties, Hansen apparently misread Alwaya's bills and he calculated her fees as including some of her costs. Her actual fees totaled $4,600, which he overstated by $2,440.58. Adjusting for this error, the actual total fees or lodestar amount was $684,003.75.

The trial court's award of $416,581.37 is a little under 61 percent of this lodestar amount. What has intrigued us is that the award is so precise and down to the penny, not $416,581.38 or $416,581.50 or $416,600. This precision suggests that it is the product of some mathematical computations. We have tried in vain for days to recreate this result by means of various formulas. We share some of our calculations below.

Semha Alwaya billed $250 per hour and charged her time in 1/10 of an hour increments. One-tenth of an hour would be a charge of $25. No amount of adding or subtracting 10ths of hours would yield a charge ending in 37 cents.

The Bowman firm billings totaled $173,540, reflecting attorneys charging either $200 or $250 per hour and paralegals $95. Like Alwaya, the practice of that firm was to charge for time in 1/10 of an hour increments. One-tenth of their various charges would be $9.50, $20 or $25. Again, no amount of adding or subtracting 10ths of hours would yield a charge ending in 37 cents.

Bruce Janke submitted one bill totaling $2,762.50 for 8.5 hours of work at $325 per hour. His billing increments appear to be by the half-hour, so one-half hour would be a charge of $162.50. No amount of adding or subtracting half-hours would yield a charge ending in 37 cents.

The Gorman firm billings, excluding Gorman's time, totaled $521,098.25 for Hansen's time at $250, $260, and $280 hourly and paralegal time at $95 and $110 per hour. The practice of that firm was to charge for time in quarter-hour increments. Quarter-hour increments at their varying rates would be $62.50, $65, $70, $23.75, and $27.50. Again, no adding or subtracting of quarter-hour increments would yield a charge ending in 37 cents.[35]

While it is apparent that the trial court's award represents a reduction from the lodestar amount, after a long study we are at a loss to rationalize the award of $416,581.37. If the court considered the case to have been overlitigated in light of factors such as the nature and difficulty of the litigation or the amount involved, the court might have subtracted some of the hours claimed, but there is no whole number of billable fractions of hours that could be subtracted from the lodestar amount to yield its result. Instead of calculating a total number of excessive hours, the trial court might have applied a negative multiplier. But the trial court's award represents no exact fraction of the lodestar amount. Alternatively, the court might have considered some of the hourly rates to be too high, and reduced the lodestar amount in that fashion. But using the billing practices of any of the attorneys involved, the only way to arrive at a 37 cent remainder is take 1/10 of $3.70, one-quarter of $1.48, or one-half of 74 cents. There is no evidence in the record that these would be reasonable hourly rates for attorneys or paralegals in the area.

Instead of reducing the lodestar amount for any of the above reasons, the trial court might, as suggested by contractor, have determined that some percentage of these fees should be attributed to defendants who did not participate in the settlement (although there was no evidence of how much time plaintiffs spent litigating with nonsettling defendants) or that contractor should not bear the sole responsibility for the fees involved in litigating with other settling defendants (because it did not cause that litigation). The difficulty with this assumption is that the award represents no exact fraction of the lodestar amount, not 41 percent or any other percent.

---

[35] We do realize that half of 75 cents would be 37.5, which could be rounded down to 37 cents. But half of $23.75 is $11.875, which would be rounded down to $11.87. Adding an increment of 50 cents to this amount, such as Janke's bill of $2,765.50 would yield $2,777.37. The trial court would have halved a charge of $23.75 only by concluding that a Gorman paralegal should have charged for an eighth of an hour instead of a quarter-hour. This illustrates the sheer speculation involved in attempting to recreate the trial court's reasoning process.

We might be able to conclude that the trial court was acting within its considerable discretion to award reasonable attorney fees if the court had given any one of these reasons or cited any other factor recognized in case law for reducing the lodestar amount. However, after much puzzlement and frustration, we have been unable to surmise any mathematical or logical explanation for the trial court's award of $416,581.37. Instead, the number appears to have been snatched whimsically from thin air. It is the essence of arbitrariness to make an award of attorney fees that cannot be justified by the plaintiffs' request, the supporting bills, or the defendant's opposition. We are unable to ascertain a reasonable basis for the trial court's reduction of the lodestar amount. (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 155–156 [50 Cal.Rptr.3d 273]; cf. *Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 686 [214 Cal.Rptr. 461].)

 We adhere to our earlier conclusion that there is no general rule requiring trial courts to explain their decisions on motions seeking attorney fees. In cases where the award corresponds to either the lodestar amount, some multiple of that amount, or some fraction requested by one of the parties, the court's rationale for its award may be apparent on the face of the record, without express acknowledgment by the court of the lodestar amount or method. When confronted with hundreds of pages of legal bills, trial courts are not required to identify each charge they find to be reasonable or unreasonable, necessary or unnecessary. The party opposing the fee award can be expected to identify the particular charges it considers objectionable. A reduced award might be fully justified by a general observation that an attorney overlitigated a case or submitted a padded bill or that the opposing party has stated valid objections.

 It is the constitutional obligation of the appellate court to "determine causes . . . in writing with reasons stated." (Cal. Const., art. VI, § 14.) A trial court's award of attorney fees must be able to be rationalized to be affirmed on appeal. In the absence of any explanation or comments by the trial court, we have unsuccessfully scrutinized the documents submitted by the parties to find reasons justifying the awards in this case. When a trial court makes an award that is inscrutable to the parties involved in the case, and there is no apparent reasonable basis for the award in the record, the award itself is evidence that it resulted from an arbitrary determination. It is not the absence of an explanation by the trial court that calls the award in this case into question, but its inability to be explained by anyone, either the parties or this appellate court. We are compelled to conclude that there is no reasonable connection between the lodestar amount and the trial court's award.[36]

---

[36] In reaching this conclusion, we do not intend to suggest that the trial court was required to award the lodestar amount. We and contractor have identified a number of reasons that

## DISPOSITION

The judgment is reversed. The case is remanded for further proceedings consistent with this opinion, which may include further briefing and a hearing as deemed helpful by the trial court.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied November 14, 2009, and the opinion was modified to read as printed above.

---

might support a reduced award. Our problem with the award here is that the award provides no evidence that trial court either adopted or rejected any particular arguments by the parties.